[Crim. No. 16155. In Bank. Aug. 16, 1972.]

In re RODERICK P., a Person Coming Under the Juvenile Court Law.
KENNETH E. KIRKPATRICK, as Chief Probation Officer, etc.,
Plaintiff and Respondent, v.
RODERICK P., Defendant and Appellant.

## Counsel

Richard S. Buckley, Public Defender, James L. McCormick, John J. Gibbons, Bitner R. Winckler and Laurance S. Smith, Deputy Public Defenders, for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Beverly K. Falk, Deputy Attorney General, for Plaintiff and Respondent.

## Opinion

**PETERS, J.**—Roderick P., a minor, appeals from a judgment of the Superior Court of Los Angeles County, Juvenile Division, finding him to have committed manslaughter (Pen. Code, § 192) and declaring him a ward of the court. (Welf. & Inst. Code, §§ 602, 725, subd. (b).)

Two issues are presented by this appeal. First, whether there is sufficient evidence to sustain the petition before the judge beyond a reasonable doubt, and secondly, whether a waiver of constitutional rights was intelligently made. We have concluded that the evidence is insufficient to establish guilt, and that the waiver was invalid.

Roderick P. is a 14-year-old mentally retarded child of slight build, weighing less than 100 pounds, and between 4 and 5 feet tall.

On Saturday morning, October 3, 1970, at approximately 9 a.m., Mr. Gillespie arrived home from work. He worked on the night shift which customarily was from 3:30 p.m. until 3 a.m., but on this night he worked until 5 a.m. After work he stopped at the home of his wife's sister and stayed there, drinking beer, for about three hours. Upon arriving home, and while attempting to unlock the front door, he discovered that the chain lock was still engaged. After calling to his wife without receiving an answer, he forced the door open, breaking the chain from the wall. Inside the house he discovered his wife's body lying on the living room floor covered with blood. Concluding that she was dead, Mr. Gillespie called the police and touched nothing until they arrived.

The police determined that the victim had been stabbed to death sometime between the hours of 9 p.m. the previous night, a Friday, and 1:30 a.m. the following morning. Of the 19 stab wounds in the victim's body the coroner concluded that only two had been inflicted before her death.

The first two had killed her by puncturing her pulmonary artery and her heart. Some of these wounds had been inflicted with such savage force that they caused her breast bones to shatter. The two murder weapons found near the body, a pair of cutlery knives, had been wielded in such a violent manner that the metal blades had been broken off and the handles torn from the shafts to which they were attached. Although the body did not appear to have been dragged, it had been beaten severely by a person or persons of exceptional strength. Nothing appeared to have been stolen, although a few coins were discovered in the grass behind the house. It was difficult to determine whether the house had been ransacked because the victim, a crippled alcoholic, kept her home in a constant state of disarray.

The only fingerprints uncovered in the house which did not belong to either the victim or her husband were located in the bathroom; a palm print on the side of the bathtub and the single impression of a finger on the outside of an upper pane of glass in the window over the bathtub. Both of the prints discovered belonged to the same individual and appeared to have been made as the person lowered himself through the window into the bathtub. This assumption was corroborated by the fact that the screen on the outside of the window had been buckled back in order to facilitate entrance into the house. There were no prints on the murder weapons because the handles were too absorbent and uneven in texture to hold them.

Some cigarette butts with brown filters had been discarded in various parts of the house; alongside them were half-burnt wooden matches. The husband of the victim testified that neither his wife nor he smoked that brand of cigarette nor used wooden matches. Because the back door had been left unlocked, the police concluded that the killer exited through it. When the body was discovered the television which the victim usually watched was off.

During their investigation that same Saturday morning the police questioned Keith, a 13-year-old boy, who lived next door to decedent and who had known appellant for about two years. Keith, who is a husky child, told the officers that after returning home about 11 p.m. the previous night he noticed that the victim's back door was open, the kitchen light was on, and the television was blasting. He observed this while quieting his dogs in his yard immediately adjacent to the victim's house.

That afternoon the officers returned to Keith's home. They asked Keith's mother whether she recognized one of the murder weapons; she replied that it resembled one out of a new cutlery set of six she had recently purchased. Upon examining her set of knives she discovered that one knife

was missing. Keith was then asked where he had been the night before until 11 p.m., when he returned home. He said he had been with some friends in Los Angeles. He later admitted at the hearing that he had been drinking both in Compton and in Los Angeles.

Taken to the station to make a statement, Keith repeated what he had told the officers earlier; however, on this occasion he mentioned a number of children who had in the past few weeks stolen a purse and a radio from the victim's house. Although a large number of children, both boys and girls had been involved, Keith singled out Roderick and one of Roderick's friends, Castille, as particularly culpable. Keith said that he returned the purse to the victim. A check of police records revealed that burglary of a radio had been reported by the victim earlier in the week. It was later discovered at the hearing that Keith had been expelled from school for misconduct at the time these events took place. Keith was not held by the officers after making the statement, and was subsequently granted immunity from any prosecution.

The police did not question the suspects mentioned by Keith until after midnight, on Sunday, October 4. At 12:15 a.m. Officers Franzese and Loreto arrived at Roderick's house which is about four blocks from the Gillespie residence, and were admitted by his parents. The officers informed them they were investigating a murder and a burglary and that they wanted to take their son to the station for questioning. Roderick's mother and father went to his bedroom and woke him. His mother asked him what he knew about a murder and he responded that he had heard the children talking about the death of a woman in the neighborhood. When Roderick entered the living room one of the officers told his father that he would advise the minor of his rights. The officer did not read the rights from a form, but recited them from memory. However, Roderick's father testified that because they were given in such a rapid manner he was unable to follow what was said. Roderick was then asked if he understood his rights, to which he responded affirmatively by nodding his head. He gave the same response to the officer's request that they talk. During the entire exchange Roderick rocked back and forth with his fingers in his mouth.

Roderick's nonverbal and unresponsive behavior may be explained by the fact that he is mentally retarded. This fact was established at the hearing and remains undisputed. He attends special classes for the mentally retarded, and his infirmity was confirmed by a psychiatrist who examined him at juvenile hall. After the *Miranda* warnings were given (*Miranda* v. *Arizona*, 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d

974]), Roderick's father asked the officers if he should obtain an attorney. The officers responded that it was his decision to make. Roderick was then taken to the station without his parents, who were instructed that he would be returned home later. Roderick had never been arrested before.

After he was fingerprinted Roderick was interrogated by the two officers until about 1:40 a.m. He was not readvised of his rights. When asked whether he participated in a scheme whereby he and other children would ask for a glass of water at the victim's house while another would sneak in and steal her purse, he admitted he had. He also admitted acting as a decoy in a similar scheme to steal a radio from the victim. And finally, he told the officers that he had held open a bathroom window at the victim's house in order that one of his friends could crawl through it. He denied having entered the house himself and said that the occurrence took place on Thursday (which was the day before the murder). The police officer testified that Roderick denied having been at the victim's house on the day of the homicide.

Meanwhile, late that same night, the police also apprehended the other suspect implicated by Keith as one of the thieves of the purse and radio, 12-year-old Castille. Like appellant, he was a small boy, weighing somewhat less than 100 pounds. He, too, was apprehended at his home and pulled out of bed. He was not advised of his constitutional rights until he was taken to the station. His parents were not present at that time. He waived his right to remain silent also. It may be significant to note that this minor, like appellant, never stated that he did not understand what he was being told and never used the word "No."

After having been fingerprinted and told to wait at a desk in the station for approximately two and a half hours, Castille was interrogated. At this time it was past 3 a.m. He also admitted participating in the theft of both the purse and the radio and holding the bathroom window open so that a third youth, Eric, could crawl through.

Eric was arrested the following day. He was a 13-year-old, also weighing less than 100 pounds. His fingerprints matched those found in the victim's house. Eric also stated that he had crawled through the window the previous Thursday. He denied that he knew anything about the murder of Mrs. Gillespie.

At the juvenile hearing in the superior court, the district attorney indicated that the charges of burglary and murder were based on a conspiracy theory in which it was alleged that Roderick had conspired to kill and rob Mrs. Gillespie.

A police criminologist testified that the prints made on the bathtub and the window could have been made at any time. The coroner testified that the savageness of the wounds inflicted upon the victim indicated that the person who killed her was strong. Although he did not rule out the possibility that they could have been inflicted by any of the three defendants, each of whom weighed less than 100 pounds, he opined that it was "very unlikely."

A psychiatrist who examined Roderick for approximately three hours at juvenile hall testified that he was retarded, became confused easily, was passive, susceptible to suggestion and that it was very unlikely that he would ever initiate any aggressive or destructive act against anyone. It was also pointed out that Roderick did not know the months of the year, what his father did for a living, how to spell either his parents' or his sisters' names or their ages. Moreover, this witness testified that in order to minimize confusion and avoid confrontation when he did not comprehend what he was being asked, Roderick would passively accept what was told him and answer in a way that appeared more approbatory of his interrogator's wishes. This testimony was unrefuted and unchallenged by the prosecution.

Keith apparently was intended to be the prosecution's key witness. When he took the stand he testified in a slow, hesitant and very reluctant manner. Countless times during his testimony he was admonished by the court for speaking too low or making evasive or unresponsive answers. His testimony was very confused and contradictory. At one point a defense attorney moved to exclude the testimony on grounds that it was worthless.

Although the district attorney agreed that the witness had to be led and that what he said was inconsistent and contradictory, he nevertheless, believed it was credible. In denying the motion to exclude Keith's testimony, the court stated: "I don't think there is going to be any weight left to give this witness' testimony" and "his testimony is getting less and less heavy, as time goes on, and I don't think I am going to be able to pay much attention to what he has said." At another point Keith admitted that he would lie to protect himself; and at yet another he stated, when asked whether he was telling the truth, that he did not know. He admitted that some of the facts he had testified to had been told to him by his mother and most of the rest of his testimony which concerned the theft of the purse and the radio was based upon statements of others. With respect to the day of the murder he admitted not having seen the three juveniles at all. As to his own activities the night of the murder he said that he had been drinking beer with some of his older friends.

Apparently disappointed with the testimony of this witness, the district attorney moved to admit his prior testimony given to the police at the interrogation in order to "impeach" the witness and refresh his recollection. This technique failed to establish any further facts and the confusion became even greater. After reading two questions and answers from the police interrogation and asking Keith to explain his remarks, the district attorney gave up and excused the witness.

There followed a series of witnesses who testified as to the whereabouts of Roderick and his two codefendants during the afternoon, evening, and night of the murder, Friday, October 2, 1970. All the testimony was consistent and uncontradicted. It accounted for the defendants', including Roderick's, presence at a high school football game, at McDonald's Drive-in and their arrival at home. The only period of time during which they were unobserved occurred when they walked from McDonald's Drive-in to their respective homes. This took slightly less than an hour and was between 11 p.m. and midnight. The witnesses included, inter alia, the janitor and other observers at the football game and numerous patrons at the drive-in. On their return they were greeted by their parents and appeared calm and unmussed.

Additional testimony was given by Roderick's teacher and principal who testified that he was a good, quiet boy who was not a troublemaker nor a fighter. There was also evidence that Keith regularly smoked Kool cigarettes which had brown filters like those found at the murder scene. He was also familiar with the victim's house inasmuch as he emptied garbage for her.

After hearing all the evidence the judge acquitted Roderick and his codefendants of the burglary charge but found them to have violated Penal Code section 192 (manslaughter). Roderick spent two months in a camp and is presently home with his parents.

It is the function of this court in reviewing a criminal conviction on appeal to determine whether the record contains any substantial evidence tending to support the finding of the trier of fact, and in considering this question we must view this evidence in the light most favorable to the finding. (*People* v. *Redmond*, 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].) The test is not whether guilt is established beyond a reasonable doubt. (*People* v. *Redmond, supra*, 71 Cal.2d 745, 755; *People* v. *Hillery*, 62 Cal.2d 692, 702-703 [44 Cal.Rptr. 30, 401 P.2d 382].)

" '[T]he appellate court is required to determine whether a reasonable trier of fact could have found that the prosecution sustained its burden

of proving the defendant guilty beyond a reasonable doubt [Citations]. The prosecution's burden is a heavy one: "To justify a criminal conviction, the trier of fact must be reasonably persuaded to a near certainty. The trier must therefore have reasonably rejected all that undermines confidence." [Citation.] Accordingly, in determining whether the record is sufficient in this respect the appellate court can give credit only to "substantial" evidence, i.e., evidence that reasonably inspires confidence and is "of solid value." ' As *Bassett* [*People* v. *Bassett,* 69 Cal.2d 122, 139 (70 Cal.Rptr. 193, 443 P.2d 777)] points out, this rule has also been applied in numerous cases involving the sufficiency of evidence as to matters other than identification." (*People* v. *Redmond, supra,* 71 Cal.2d 745, 755-756.)

In analyzing the evidence upon which to base a conclusion of substantiality, we pointed out in *Redmond:* "Evidence which merely raises a strong suspicion of the defendant's guilt is not sufficient to support a conviction. Suspicion is not evidence; it merely raises a possibility, and this is not a sufficient basis for an inference of fact. [Citations.]"

We are satisfied that the same principles are applicable to a review on appeal of the sufficiency of the evidence to support a finding in a juvenile proceeding that the minor violated a criminal statute. The landmark case of *In re Gault,* 387 U.S. 1 [18 L.Ed.2d 527, 87 S.Ct. 1428], decided that the due process clause does require application during the adjudicatory hearing in a juvenile proceeding of " 'essentials of due process and fair treatment.' " (*Id.,* at p. 30 [18 L.Ed.2d at p. 548].) Subsequently in *In re Winship,* 397 U.S. 358, 368 [25 L.Ed.2d 368, 377-378, 90 S.Ct. 1068], the United States Supreme Court held that proof beyond a reasonable doubt is among the "essentials of due process and fair treatment," required during the adjudicatory stage when a juvenile is charged with an act which would constitute a crime if committed by an adult.

In *Richard M.* v. *Superior Court,* 4 Cal.3d 370, 378 [93 Cal.Rptr. 752, 482 P.2d 664], this court followed the rule announced in *Winship.* Since the standard of proof in juvenile proceedings involving criminal acts is the same as the standard in adult criminal trials, the principles of appellate review in criminal trials as announced in *Redmond* are applicable to the appellate courts in considering sufficiency of the evidence admitted in the juvenile proceeding.

Viewing the evidence in a light most favorable to the judge's finding, as we are required to do, we must recognize that there is substantial evidence (1) that by distracting Mrs. Gillespie in asking for a drink of water, Roderick participated in the theft of both her purse and her radio and (2) that by lifting a window screen so as to permit one of his friends

to enter the victim's house, Roderick participated in breaking into her house. However, all of the evidence points to the conclusion that the theft occurred a week before the homicide and the breaking into the house the day before.

On the other hand there seems to be substantial evidence indicating that Roderick *did not* commit the act charged. The coroner testified that an exceptional force was used to kill Mrs. Gillespie. He based this conclusion on the shattered breast bones of the victim, and the broken knives found close to the body. He also indicated that the body had been beaten severely by a very strong person or persons. Yet Roderick and each of his codefendants were of slight build weighing less than 100 pounds. Furthermore, the psychiatrist who examined Roderick testified that he was very passive, retarded, and that it was highly unlikely he would ever initiate any aggressive or destructive acts against anyone. This opinion was reaffirmed by the testimony of his teacher and principal.

Several alibi witnesses offered substantial evidence that Roderick and his codefendants were not in the neighborhood of the Gillespie residence on the night of October 2, 1970.

Finally, not even after being awakened at 12:15 a.m. and taken to the police station without his parents where he was subjected to approximately one hour of interrogation resembling the third degree custodial interrogation Chief Justice Warren was referring to in *Miranda* v. *Arizona, supra,* 384 U.S. 436, 445-458 [16 L.Ed.2d 694, 707-714], did Roderick admit any involvement in the murder of the victim or to being present at the victim's house on the night of the murder.

We conclude that there is no substantial evidence to link Roderick to the homicide.

Roderick's second contention concerns the propriety of the *Miranda* warnings given him by the arresting officer. He argues that the waiver of his right to remain silent was unconstitutionally obtained and thus the statements given could not be used as evidence against him at the adjudicatory hearing.

■ Statements obtained from juveniles in violation of *Miranda* are inadmissible in juvenile proceedings under section 602 of the Welfare and Institutions Code. *(In re Steven C.,* 9 Cal.App.3d 255, 267 [88 Cal.Rptr. 97]; *In re Donnie H.,* 5 Cal.App.3d 781, 790 [85 Cal.Rptr. 359]; *In re H.L.R.,* 269 Cal.App.2d 610, 616 [75 Cal.Rptr. 308]; *In re Rambeau,* 266 Cal.App.2d 1, 5-9 [72 Cal.Rptr. 171]; *In re Teters,* 264 Cal.App.2d

816, 819-824 [70 Cal.Rptr. 749]; see *People* v. *McFarland,* 17 Cal.App.3d 807, 815-816 [95 Cal.Rptr. 369].)

In *People* v. *Lara,* 67 Cal.2d 365 [62 Cal.Rptr. 586, 432 P.2d 202], it was held that the capacity of a minor to make a voluntary statement to the police depends not only upon his age but on a combination of factors such as intelligence, education, experience, and his ability to comprehend the meaning and effect of his statement. The court also stated that, "if the minor is mentally retarded or of subnormal intelligence for his age . . . that is a factor weighing heavily against a finding of capacity." (At p. 385.)

In view of Roderick's unrefuted retardation and immaturity, and the fact that it was his first offense, it is unlikely that he was able to comprehend the extent of the rights he waived. Furthermore, his inability to appreciate the consequence of his statements and the waiver seems to be reinforced by the fact that he had been asleep prior to the arrival of the police at 12:15 a.m. and his parents had awakened him just minutes before the police advised him of his *Miranda* rights and obtained the waiver in question. Without his statements, there does not appear to be any evidence to place Roderick at the house on the night before the homicide.

We conclude that Roderick did not validly waive his *Miranda* rights and that his statements should not have been admitted into evidence.

The judgment is reversed.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.