[Civ. No. 7423. Fifth Dist. Dec. 19, 1983.]

In re MICHAEL B., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL B., Defendant and Appellant.

**COUNSEL**

Hugh B. Fielder, under appointment by the Court of Appeal, and Mary L. Fielder for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Daniel J. Kremer, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Robert D. Marshall, Eileen Ceranowski and Maureen A. Daly, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**FRANSON, Acting P. J.**—Appellant, a nine-year-old boy, was declared to be a ward of the juvenile court under Welfare and Institutions Code section 602 after a finding that he committed involuntary manslaughter by shooting another boy in violation of Penal Code section 192, subdivision 2.[1] The juvenile court found appellant had no intent to kill but "there was an intent

---

[1]Penal Code section 192, subdivision 2, in pertinent part defines involuntary manslaughter as "the unlawful killing of a human being, without malice . . . in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection; . . ." The statutory phrase "without due caution and circumspection" is the equivalent of criminal negligence. (*People* v. *Penney* (1955) 44 Cal.2d 861, 869 [285 P.2d 926].)

to commit a reckless and dangerous act." Appellant was placed on four years probation less two days served in juvenile hall subject to certain conditions.

The trial court's adjudicatory holding was based in part on appellant's trial testimony and six pretrial statements given by appellant during police interrogation. The prosecution argued the inconsistency in the testimony and the statements was evidence of consciousness of guilt.

We reach the following conclusions: (1) The record does not support a finding that appellant's waiver of his *Miranda*[2] rights before giving the first five statements was knowing, intelligent and voluntary beyond a reasonable doubt. Because the five statements prejudiced appellant, the judgment of wardship must be reversed. (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].) (2) The other evidence against appellant does not constitute "clear proof" that at the time of the shooting appellant understood the wrongfulness of the act charged against him, as required by Penal Code section 26, subdivision One.[3] (3) Nor does the evidence that appellant committed involuntary manslaughter meet the constitutional standard of proof beyond a reasonable doubt required at the adjudicatory stage in juvenile proceedings. (*In re Winship* (1970) 397 U.S. 358, 363 [25 L.Ed.2d 368, 374-375, 90 S.Ct. 1068]; *Richard M.* v. *Superior Court* (1971) 4 Cal.3d 370, 378 [93 Cal.Rptr. 752, 482 P.2d 664].) Accordingly, appellant cannot be retried under the double jeopardy clause of the United States Constitution, Fifth Amendment. (*In re Johnny G.* (1979) 25 Cal.3d 543, 548-549 [159 Cal.Rptr. 180, 601 P.2d 196]; *People* v. *Pierce* (1979) 24 Cal.3d 199, 209-210 [155 Cal.Rptr. 657, 595 P.2d 91].)

## THE FACTS

Appellant, nine years old, and the victim John Castro, fourteen years old, were playing together during the afternoon of February 18, 1982. While riding their bikes, appellant and the victim went to Marty D.'s home where Marty was shooting a BB gun. Appellant was permitted to shoot the BB gun but when he pointed it at the victim, he was told by Marty not to do so. Appellant and the victim then proceeded to shoot the BB gun at a can.

---

[2]*Miranda* v. *Arizona* (1966) 384 U.S 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

[3]Penal Code section 26, subdivision One, reads: "All persons are capable of committing crimes *except* those belonging to the following classes: [¶] . . . Children under the age of 14, in the absence of *clear proof* that at the time of committing the act charged against them, they knew its wrongfulness." (Italics added.)

After leaving Marty's house, appellant and the victim ended up at appellant's house where the death of the victim occurred at approximately 4:30 p.m.

Appellant's father kept a .22 caliber rifle in the entryway closet of the family home to "scare off dogs." The rifle was in a loaded condition with the safety probably off. Although appellant had once shot the rifle, he had never been taught how to use the gun nor had he received any instruction on the gun's safety mechanism or on safety rules for handling guns. Nevertheless, appellant's father had "mentioned" to appellant that it was unsafe to point a gun at anyone. He had warned appellant to stay away from the gun. Appellant also had been told by his parents not to have playmates in the house when they were absent.

The victim was 18 to 24 inches from the muzzle of the gun when it was fired by appellant. The bullet struck the victim in the center of the chest, piercing the heart.

Appellant was hospitalized after the shooting because he was hysterical, frightened and incoherent. He was hyperventilating. At the hospital, he was given a "shot," and valium was prescribed to calm him down. Appellant was then taken to the sheriff's office with his parents where he was interrogated by Officer Ralph Diaz beginning at 8:15 p.m. The officer described appellant as "a scared little boy." According to Officer Diaz, he gave appellant his *Miranda* rights, including the right to have his parents present before and during questioning. Appellant said he understood his rights. Appellant and his parents also signed a written waiver of appellant's rights. Appellant was readvised of his rights about one-half hour later before he gave a tape-recorded statement. When appellant was readvised of his rights, he told the officer that he did not understand the right to an attorney. Officer Diaz later testified that he did not know whether appellant understood his rights the first time that they were explained but that appellant acknowledged he understood his rights after they were explained the second time.

The officer testified that during the interrogation appellant was "hyperventilating. He was crying. And he was nervous." According to the officer, this was when appellant was talking about the shooting, "not during the Mirandizing." Although the officer did not recall being told the type of medication appellant had taken, he acknowledged it was mentioned.

Appellant's mother Janet testified that she was present at appellant's interrogations. Both times appellant was advised of his *Miranda* rights at the first interrogation; she told him what to say by nodding her head. Janet also noted that appellant had never been in trouble before and had had no prior

police contact. She did not believe her son understood his *Miranda* rights. He did not want to talk to anyone. She had told her son when they went down to the station to "be very, very honest . . . . The sooner you tell the truth, we'll get it over with, and don't leave anything out, that was my objective. I wanted everything to be told and over with. I wanted to cooperate. We all did." Janet was asked, "And every time that he answered that he understood these questions, you were prompting him, is that correct?" "As far as if he wanted to say yes or no, yes I was," she answered.

Janet never explained to appellant any of the rights related by Officer Diaz.

Janet also testified that she had been told by Sergeant Robert Byrd, a Tulare County Deputy Sheriff and a lifelong friend who was at the house after the shooting before the first interrogation, that she was "not to worry." Specifically, Sergeant Byrd "had told me at the house before Mike went to the station . . . that they pretty much knew what happened, but Mike is so hysterical that they want him to calm down, *and to not worry* that they pretty well knew what happened." (Italics added.) Janet asked Sergeant Byrd what did happen and "[h]e says well, at this point I would rather not say. We will talk to him later down at the station when we finish up here." Janet had known Sergeant Byrd since she was a child.

The court ruled on the *Miranda* objection as follows: "Well, unfortunately the Court, in assessing the voluntariness of a Miranda waiver with respect to minors, the Court has to weigh a number of factors.

"And the Court has to determine whether in fact the statements made by the minor were as a result of his free will, and also a rational intellect. But this has to of course, in my opinion, be viewed in light of the minor's even by this standard allowing for his sophistication in light of his sophistication and his age.

"And the Court can really find nothing on this record to indicate that it wasn't. There was no promise of leniency made here by the officer, *not even the slightest hint of that.*

"What the minor's decision in this matter may have been, may have been prompted by his mother, but it doesn't show that even her actions in that part, that she had in fact been made a police agent by a promise to her of any special treatment for her son, so that she in doing these things was doing it entirely on her own.

"And I fail to see how that had any effect of overbearing this minor's choice by the promise of any special treatment or any other improper matters.

"And with respect to his emotional state, it's undoubtedly true that the minor was highly emotional about all this, but this Court has heard no evidence that in fact it could sustain a conclusion that he was in fact, so emotionally overwrought that—at the time that the questioning was going on, that in fact he didn't possess a rational intellect. You may proceed." (Italics added.)

Appellant gave six different statements to the police. In the first statement appellant said he had shown his dad's gun to the decedent, and it went off as he put it away.

After Officer Diaz said he did not believe appellant's story, a second statement was given approximately 30 minutes later at 9:40 p.m. without the benefit of further *Miranda* warnings. Appellant said that he was holding the rifle with his right hand over the trigger housing while the victim was looking at an Atari set, "and that as he turned to turn away from the victim . . . the rifle discharged."

The third statement was taken 10 minutes after the second statement, again without any further *Miranda* warnings. In this statement, appellant admitted that he was pointing the gun at the victim, showing it to him when the rifle discharged as he turned to put the rifle away.

A fourth statement without further *Miranda* warnings was taken late that evening at about 11:30 to 12 p.m. at appellant's home, but differed little in substance from the earlier statement.

A fifth statement was taken at the sheriff's office on February 19th, the day after the shooting. There was some talk about appellant taking a lie detector test. Again, appellant was not advised of his *Miranda* rights. At this interview, appellant said he told the victim to leave the Atari set alone, but the victim paid no attention to him. Appellant pointed the rifle at the victim to scare him away but this had no effect on the victim. Appellant had his hand on the trigger and "the rifle went off, or discharged accidentally at the time he was pointing the rifle at the victim." Appellant said he did not mean to shoot him. During the interview, appellant started hyperventilating, had shortness of breath and was weeping; he again had to be taken by ambulance to the hospital.

After the February 19th interview, the officers called appellant's parents to tell them appellant would have to be brought down to the station again so that he could be "booked into juvenile hall for investigation of homicide." When appellant was taken to the station on February 22, a sixth and final interrogation was conducted on tape. Inexplicably, this questioning of

appellant was initiated by appellant's mother and not by Officer Diaz. Appellant was readvised of his *Miranda* rights and indicated he understood them. Appellant told the officers in this statement that he was alone in his house before the shooting, and the victim forced his way into the house even though he had been told that appellant's parents did not want anyone in the house. The victim began playing with the family Atari set. Appellant went to the closet and took out the .22 caliber rifle to try to scare the victim into leaving. The victim started taking the family Atari set apart. When appellant told the victim to leave, the victim tried to bully appellant; he told appellant he was going to call his brother and beat up appellant and his parents. "He said he was going to hurt my mom and dad and me." Appellant pointed the rifle at the decedent because he was afraid and pulled the trigger. According to Officer Diaz, appellant did not mention the shooting being an accident: "He said he was scared and that's why he fired the shot." Appellant did not think the gun was loaded when he pointed it at the victim. He did not cock the gun or put a shell into the chamber before firing. The officer further testified that at the time of this interview, appellant was a little calmer, "but there again during certain phases of the taped interview, he started crying and having shortness of breath." A photograph of the Atari set taken at the scene did not show anything disturbed in the set or the box.

Appellant testified on his own behalf. He stated that the day of the shooting was the first time he had ever really talked with or played with the decedent. Prior to that time, appellant had only seen the decedent riding his bike and had said "hi" to him. The two boys rode their bikes to Marty B.'s house where they shot a BB gun. Marty had a motorcycle, and appellant helped Marty fix it. The decedent then followed appellant to his house. Once inside, they began to talk about guns. Appellant brought his father's gun out of the closet to show to the decedent. The decedent then walked over to the Atari set. Appellant then asked the victim to leave because "my mom and dad were gonna be home." He asked the older boy to leave "two, three times." Contradicting his prior statements, Appellant said the decedent never threatened him. Appellant further testified that right after he asked the victim to leave, the gun went off while it was pointed at the victim. In answer to a question as to how it happened that he pressed the trigger, appellant said, "I had my finger in it, and I just barely pushed it." "Did you push it because you wanted to push it?" "No . . . it went off."

Appellant did not know the gun was loaded, and he had not checked the safety. When the gun was fired, the stock was under appellant's arm and not on his shoulder.

Appellant testified he had shot the gun once before, "a long time ago." Appellant did not know how to tell whether the safety was on or off.

Dr. Stephen Bindler, a licensed psychologist, testified he interviewed appellant on three occasions. Dr. Bindler described appellant as a "youngster of average range intellectual ability." During the interviews, Michael also gave the psychologist a number of different versions of the events. It was Dr. Bindler's opinion that appellant did not deliberately shoot the victim.

Dr. Bindler opined that the reason appellant gave so many versions of the facts was because he panicked and was in shock. From the information given to the doctor which included the statements made to the police, the hospital records and the interviews with the minor, the doctor concluded that immediately after the shooting appellant was extremely frightened to the point of panic. When appellant discussed the incident with the psychologist during the interviews he began to demonstrate the same kinds of symptoms of panic, perspiration, hyperventilating, becoming extremely nervous and uneasy. Appellant was most concerned that his parents would be angry at him for going against the rules about not having anyone in the house and not playing with the guns his father kept at home.

Dr. Bindler further commented he did not find appellant to be a criminal or criminally minded youngster. "I didn't find him to be outside the specific incident in which he is involved, I didn't find any evidence of anti-social behavior or of—of extreme hostility or anger that Michael has for anyone. [¶] Instead, I found a frightened, a frightened little boy."

Dr. Bindler stated that in the general sense appellant was capable of understanding the difference between life and death, but not in the same way an adult does, i.e., a nine year old truly does not understand the permanence of death: "I don't think that Michael had a clear understanding that—the possibility for this kind of outcome existed at the time."

On cross-examination, Dr. Bindler amplified the difficulty a child has in dealing with death: "Children think of life as—and of death in terms of the games they play and the television programs they see, and the things that go on around them in the general world, not in the direct sense of permanence of the destruction that happens, that can happen in certain situations. . . . And it's not uncommon for children of nine, who have lost relatives to death in one way or another, to wonder about where their relatives are, and when they'll come back."

Dr. Bindler agreed that a child could understand that fire burns, even though he has not had his hand over the fire. In the same way he can understand that a gun mishandled can kill, even though he has only seen that on television. However, Dr. Bindler pointed out: "The fact that a youngster of the age of nine can be aware that a gun kills does not neces-

sarily mean that given a gun that youngster of nine will behave in a prudent manner to see the gun does not kill." Appellant's difficulty of understanding the reality of the situation was illustrated by the fact he told Dr. Bindler he believed he was facing a life in prison as a consequence of his act.

The court questioned Dr. Bindler concerning whether a nine year old can appreciate the danger of his personal conduct with respect to his actions. Dr. Bindler responded that that was questionable. Nevertheless, Dr. Bindler opined that appellant recognized that it was dangerous behavior to point a gun at a playmate. The doctor, however, qualified the latter statement by declaring: "I don't believe that Michael had a—the kind of mature appreciation for the ultimate consequences of his dangerous behavior although I'm certain that he was aware that holding the gun was dangerous."

## DISCUSSION

■ In California, a minor, like an adult, may waive his *Miranda* rights provided the waiver is voluntary, knowing and intelligent. (*People* v. *Lara* (1967) 67 Cal.2d 365, 389 [62 Cal.Rptr. 586, 432 P.2d 202]; *In re Gault* (1967) 387 U.S. 1, 55 [18 L.Ed.2d 527, 561, 87 S.Ct. 1428].) Whether a minor has made such a waiver depends upon his age, education, intelligence and his experience and familiarity with the law; in other words, upon the "totality of the circumstances." (*People* v. *Lara, supra,* 67 Cal.2d at p. 389; *In re Dennis M.* (1969) 70 Cal.2d 444, 462-463 [75 Cal.Rptr. 1, 450 P.2d 296].) This "totality" approach meets the federal constitutional standard. (*Fare* v. *Michael C.* (1979) 442 U.S. 707, 725 [61 L.Ed.2d 197, 212, 99 S.Ct. 2560].)

In keeping with the philosophy that the immaturity and vulnerability of young juveniles place them at a greater disadvantage in their dealings with the police (see *Gallegos* v. *Colorado* (1962) 370 U.S. 49, 54-55 [8 L.Ed.2d 325, 329, 82 S.Ct. 1209, 87 A.L.R.2d 614]), the United States Supreme Court has declared that any purported waiver of a minor's right against self-incrimination must be *carefully scrutinized*: "The participation of counsel will, of course, assist the police, Juvenile Courts and appellate tribunals in administering the privilege. If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." (*In re Gault, supra,* 387 U.S. at p. 55 [18 L.Ed.2d at p. 561].)

■ The rules for determining whether a minor's *Miranda* waiver and confession are voluntary are summarized in *In re Peter G.* (1980) 110

Cal.App.3d 576, 582-583 [168 Cal.Rptr. 3]. There, it is explained that the same principles for determining the voluntariness of a confession are applicable in determining the voluntariness of a *Miranda* waiver: "In order to be voluntary, the confession or other incriminating statement must be the product of a rational intellect and free will. [Citation.] The confession or other incriminating statement is not the product of a rational intellect and free will, if the accused's will to resist is overborne. [Citation.] An accused's will can be overborne by pressures engendered by physical or psychological coercion on the part of law enforcement officers [citations], or by influence of drug or alcohol [citations] . . . that impairs his ability to exercise his rational intellect and free will. . . . [I]t is immaterial whether the impairment was caused by the police, third persons, or the accused himself. Nor is it material that the officers pursued no improper purpose in eliciting the confession or that the facts related by the accused are true. [Citation.] The only issue is whether the accused's abilities to reason or comprehend or resist were in fact so disabled that he was incapable of making a free and rational choice. [Citation.] To determine this overriding issue, the totality of circumstances must be considered. [Citations.]" (*Id.,* at pp. 582-583.)

■ Finally, "it bears emphasis" that in reviewing the finding of the lower court, the reviewing court is obligated to examine the uncontradicted facts and make an independent determination whether the trial court's finding of voluntariness is supported by the requisite quantum of evidence. In exercising this function, the reviewing court recognizes that the burden is on the prosecution to show that a confession (or waiver) was voluntarily given without previous inducement, intimidation or threat. (*In re Peter G., supra,* 110 Cal.App.3d at p. 583.)

The evidence is uncontradicted that appellant initially waived his *Miranda* rights and signed the written waiver form on February 18 because his mother told him to do so. Appellant did this because he was scared, and he trusted his mother. Yet the record does not show that the parents had any opportunity to discuss with Michael the meaning and consequences of a waiver of his rights before the first waiver ostensibly occurred. Nor does the record show that appellant ever discussed his rights with his parents before the second waiver took place. All that the mother knew at the time of both waivers was that her lifelong friend Sergeant Byrd of the Tulare County Sheriff's office had advised her that the sheriff's office "knew pretty much what had happened, but . . . *not to worry . . . .*" (Italics added.) This statement rationally may be construed to suggest to appellant's mother that if appellant would waive his *Miranda* rights and submit to interrogation by the officers that everything would turn out all right, i.e., that appellant would not be prosecuted for wrongdoing. The officer's advice obviously

had a strong impact on the mother and through her, on appellant as evidenced by the repeated statements thereafter given by appellant to the police. The advice may have been intended as reassurance to a friend, but it was clearly not in appellant's best interest. Based on Sergeant Byrd's representation, appellant's mother "cooperate[d] as much as [she] could" with the officers. Thus, the trial court misspoke in finding there was "not even the slightest hint of" a promise of leniency if appellant would waive his privilege against self-incrimination.

The evidence is also uncontradicted that after the shooting appellant was frightened, incoherent and hyperventilating and had to be taken to the hospital for treatment to calm him down. Yet no medical evidence was presented below as to the nature of the "shot" or the quantity of the valium administered to appellant at the hospital. Nor was any medical testimony presented as to the effect of such treatment on appellant's ability to comprehend his rights and the consequences of waiving those rights. This is a glaring omission in the light of the heavy burden placed on the prosecution to prove a valid waiver and the concomitant duty placed on the trial court to take the "greatest care" to assure that appellant's waiver and admissions were voluntary, i.e., the product of his free will and rational intellect. (*In re Gault, supra,* 387 U.S. at p. 55 [18 L.Ed.2d at p. 561]; *In re Peter G., supra,* 110 Cal.App.3d at pp. 582-583.)

Officer Diaz acknowledged that appellant still was a "scared little boy" when he was given his *Miranda* rights and signed the waiver form at 8:15 p.m., a few hours after the shooting. That appellant also was frightened and emotionally distraught during the second ostensible waiver is indicated by the fact that he started crying and hyperventilating when he was interrogated about the shooting. Moreover, when the officer was about to take the statement on tape (approximately one-half hour after appellant's initial advisement and waiver), appellant stated that he did *not* understand what it meant to be represented by an attorney. At this point, the record becomes totally confusing as to when appellant finally acknowledged that he understood what an attorney was. Even Officer Diaz admitted that "he didn't know" whether appellant had understood his right to an attorney at the time of the initial waiver.

Although appellant was of normal intelligence for a nine year old, he had had no prior experience with law enforcement.[4] Appellant was confused

---

[4]Appellant's unsophistication with law enforcement should be contrasted with the 12-year-old minor in *In re Charles P.* (1982) 134 Cal.App.3d 768 [184 Cal.Rptr. 707], where the boy was held to have waived his *Miranda* rights without the presence of a parent or interested adult. The court noted that: "Appellant was a worldly 12-year-old. He was on probation and had been advised of his *Miranda* rights on a prior occasion. . . . Considering the fact that the appellant had a prior experience with the juvenile court, it would be reasonable to assume that he knew what the role of an attorney was in the juvenile law process." (*Id.,* at p. 772.)

during all of the questioning because of what might happen to him—he thought he would have to go to prison for life. He had told his parents that he would say whatever the officers wanted him to say because he wanted to get it over with. Furthermore, appellant had been urged by his mother to cooperate fully with the officers by telling them everything they wanted to know because she had been told there was nothing to worry about. Thus, under all of the circumstances, the prosecution failed to prove beyond a reasonable doubt that appellant made a knowing, intelligent and voluntary waiver of his rights before he was interrogated five different times on February 18 and 19.

Since the five statements given by appellant on February 18 and 19 were used against appellant at his juvenile trial, we are required to assess the prejudicial effect of the statements under the standard of *Chapman* v. *California, supra,* 386 U.S. 18. (*People* v. *McClary* (1977) 20 Cal.3d 218, 230 [142 Cal.Rptr. 163, 571 P.2d 620].) To avoid reversal, respondent must show that the error in admitting the statements was harmless beyond a reasonable doubt. (*Ibid.*) This cannot be done since the statements were utilized by the trial court to show appellant's consciousness of guilt in shooting the victim.

We turn now to the questions whether (1) appellant's sixth statement,[5] his trial testimony and the other evidence in the record meet the "clear proof" standard required to show that appellant knew the wrongfulness of the act charged against him as mandated by Penal Code section 26; and (2) whether such evidence suffices to meet the beyond a reasonable doubt standard of proof that appellant acted with criminal negligence in shooting the victim. (*People* v. *Penny, supra,* 44 Cal.2d 861, 879.)

 Penal Code section 26, subdivision One, is based on the common law rule that children under 14 are presumed incapable of criminal acts unless the child possesses the requisite age and experience to understand the wrongfulness of his or her act. (Perkins, Crim. Law (2d ed. 1969) p. 837; *In re Gladys R.* (1970) 1 Cal.3d 855, 863 [83 Cal.Rptr. 671, 464 P.2d

---

[5]As we have observed, appellant's sixth statement was the result of the interrogation of appellant on February 22 after the parents had been advised that appellant was to be booked into the juvenile hall for a homicide investigation. The tape of the sixth statement indicates that it was requested by appellant's mother and not by Officer Diaz for the purpose of "setting the record straight." Since appellant and his parents had had three days after the last questioning to reflect upon appellant's prior questioning and the consequences of the earlier *Miranda* waiver and since the parents knew that appellant was going to be booked for investigation of homicide, we cannot conclude that appellant's waiver and statement of February 22 was the product of his earlier invalid waivers or the product of Sergeant Byrd's implied promise of leniency made to appellant's mother, i.e., that everything would come out all right if appellant cooperated with the police.

127].) The presumption of incapacity may only be overcome by clear proof that at the time of committing the act charged, the child knew its wrongfulness. "Only if the age, experience, knowledge, and conduct of the child demonstrate by clear proof that he has violated a criminal law should he be declared a ward of the court under section 602." (*In re Gladys R., supra,* at p. 867; see also *In re Tony C.* (1978) 21 Cal.3d 888, 900 [148 Cal.Rptr. 366, 582 P.2d 957].)

We equate the Penal Code section 26, subdivision One, standard of "clear proof" with the standard of "clear and convincing evidence" which has been defined by our Supreme Court to be proof by evidence that is " " " 'clear, explicit, and unequivocal' 'so clear as to leave no substantial doubt' and 'sufficiently strong to demand the unhesitating assent of every reasonable mind.' " " " (*People* v. *Martin* (1970) 2 Cal.3d 822, 833, fn. 14 [87 Cal.Rptr. 709, 471 P.2d 29]; *People* v. *Caruso* (1968) 68 Cal.2d 183, 190 [65 Cal.Rptr. 336, 436 P.2d 336]; see also 2 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 45.1, p. 1639.)[6]

The Attorney General's argument that because appellant had been told to stay away from the rifle and not to point a gun at anyone (once by his father and once by Marty B. when the victim and appellant were shooting the BB gun), and because appellant admitted in statement number six and at trial that he pointed the gun at the victim to get him to leave the house and that

---

[6]A persuasive constitutional and statutory argument can be made that the "clear proof" standard mandated by Penal Code section 26, subdivision One, means proof beyond a reasonable doubt. *In re Winship, supra,* 397 U.S. 358, 364 [25 L.Ed.2d 368, 375], requires as a matter of constitutional due process that all facts necessary to prove the crime charged as a basis for a juvenile wardship proceeding be proved beyond a reasonable doubt. Legal capacity to commit the crime charged obviously is essential to an adjudication of wardship under section 602. Thus, the reasoning in *In re Clyde H.* (1979) 92 Cal.App.3d 338, 343 [154 Cal.Rptr. 727] that because the Legislature may constitutionally require an adult defendant to prove insanity by a preponderance of the evidence, it may constitutionally set forth by statute the standard by which a minor of a given age shall be found guilty of a crime, is fallacious. A criminal defendant is presumed to be sane; hence, the burden of proving insanity legitimately may be placed on the defendant. However, a child under the age of 14 is presumed incapable of committing a crime, and the burden of proving otherwise is on the prosecution. If *In re Clyde H.* is correct in holding that legal capacity need not be proved beyond a reasonable doubt, the prosecution is relieved in part of its constitutional duty to prove each fact necessary to constitute the crime beyond a reasonable doubt. (*In re Winship, supra,* 397 U.S. 358, 364 [25 L.Ed.2d 368, 375].)

Furthermore, Welfare and Institutions Code section 701 was amended in 1971 to provide that "[p]roof beyond a reasonable doubt . . . must be adduced to support a finding that the minor is a person described by Section 602, . . ." This amendment seems to indicate a legislative intent that the "clear proof" standard of Penal Code section 26, subdivision One, means proof beyond a reasonable doubt of the minor's capacity to commit the crime supporting the wardship adjudication under section 602.

In any event, we need not decide the issue directly since the prosecution's evidence of appellant's capacity to commit involuntary manslaughter in the present case falls far short of the "clear and convincing" standard of proof.

he may have pulled the trigger, does not establish by clear and convincing proof that appellant appreciated the wrongfulness of his conduct as required by Penal Code section 26.

Appellant was not charged merely with pointing a gun at the victim or brandishing a weapon; rather, he was charged with committing involuntary manslaughter—the killing of a human being with criminal negligence. *People* v. *Penny, supra,* 44 Cal.2d at page 879 explains that something more than ordinary negligence is needed to constitute a lack of "due caution and circumspection" as used in Penal Code section 192, subdivision 2. ■ To impose criminal liability for homicide caused by negligence other than vehicle cases, the negligence must be *aggravated, culpable, gross or reckless.* The accused's conduct must be such a departure from what would be the conduct of an ordinarily prudent, careful person " 'as to be *incompatible with a proper regard for human life,* or, in other words, a disregard of human life or an indifference to consequences.' " (*Id.,* at p. 879, italics added.)

■ It is axiomatic that before a child may act without a proper regard for human life in the context of an unlawful homicide, he must fully appreciate the consequences of taking a life. He must appreciate the *permanence of death.* This requires more than knowledge gained through playing games or watching television that people who are shot with guns fall down and are "dead." Dr. Bindler testified that appellant as a normal nine year old did not understand the permanence of death; he did not appreciate the consequences of threatening the victim with the gun. Although the trial court was free to reject the doctor's opinions, the prosecution introduced no expert testimony to the contrary, and we find no solid, credible evidence in the record to support a finding that appellant understood the possibly fatal consequences of his actions.

Nor can appellant's appreciation of the wrongfulness of the act charged against him be inferred from the bare commission of the act itself. This would frustrate the purpose of Penal Code section 26. (*In re Tony C., supra,* 21 Cal.3d at p. 900.)

Appellant was five years younger than the victim; this is a significant age difference, particularly in the eyes of a nine year old and especially where the boys had met only shortly before the shooting. Appellant tried to get the older boy to leave his home because appellant was afraid his parents would soon arrive and find that he had violated the rule against having visitors at home during the parents' absence. Appellant pointed the gun at the older boy and pulled the trigger hoping to scare the older boy into leaving the house. Appellant thought the gun was unloaded and did not

understand the safety mechanism. Thus, the evidence concerning appellant's capacity to commit the crime charged, when viewed in the light most favorable to the judgment below, is not " " " 'clear, explicit and unequivocal' " ' "; it does not " ' " " 'demand the unhesitating assent of every reasonable mind' " ' " " as to whether appellant truly understood the wrongfulness of his act under all of the circumstances. (*People* v. *Martin, supra,* 2 Cal.3d 822, 833, fn. 14.) Giving the prosecution evidence all the intendments to which it is entitled, rational persons would still have a substantial doubt as to appellant's capacity to commit the crime of involuntary manslaughter.

Intertwined with appellant's incapacity to appreciate the wrongfulness of his conduct insofar as committing involuntary manslaughter is the question whether the properly admitted evidence proved beyond a reasonable doubt that appellant was guilty of involuntary manslaughter. In *Jackson* v. *Virginia* (1979) 443 U.S. 307, 317-318 [61 L.Ed.2d 560, 572-573, 99 S.Ct. 2781], the United States Supreme Court held as a matter of due process that the standard for evaluating the sufficiency of evidence in a criminal case is whether any rational trier of fact could find guilt beyond a reasonable doubt. ▮ The principles of appellate review as announced in *Jackson* v. *Virginia, supra,* are applicable to the appellate courts in considering the sufficiency of the evidence admitted in the juvenile proceeding. (*In re Roderick P.* (1972) 7 Cal.3d 801 [103 Cal.Rptr. 425, 500 P.2d 1]; *In re Frederick G.* (1979) 96 Cal.App.3d 353, 365 [157 Cal.Rptr. 769].)

Since the prosecution failed to sustain the burden of proving that appellant had the legal capacity to commit the crime charged, it necessarily follows that a rational trier of fact could not find appellant's conduct so aggravated, culpable, gross or reckless as to be "incompatible with a proper regard for human life" as required by *People* v. *Penny, supra,* 44 Cal.2d 861.

The Attorney General's reliance on *In re T.R.S.* (1969) 1 Cal.App.3d 178 [81 Cal.Rptr. 574] wherein the trial court upheld an involuntary manslaughter conviction of an 11-year-old boy is misplaced. Not only is there a two-year age difference between the *T.R.S.* defendant and appellant, the facts in *T.R.S.* are totally different. There, the minor had been repeatedly warned not to touch the guns (a shotgun and .45 caliber pistol) and not to play with them; his father told him "a gun is dangerous at all times," and even if "you know they're unloaded, treat them as though they are loaded because they are dangerous." In spite of these warnings, the boy played with the guns outside the house. The minor's brother again told him to take the guns back into the house and put them away, but the minor came back outside with the .45 caliber automatic pistol. On the way out of the house he pulled back the hammer on the gun which cocked the pistol; when on the outside the victim asked the boy if the gun was real, the boy replied it was a real

gun, pointed the gun at the victim who was about four feet away and pulled the trigger killing the victim. Obviously, the intelligence and maturity of an 11-year-old child concerning the wrongfulness of a particular act is different from that of a 9 year old. Likewise, an older child would have a greater ability to foresee the consequences of an act such as that involved herein. Furthermore, in *T.R.S.*, unlike this case, there was no expert psychological testimony indicating that appellant did not understand the fatal consequences of pointing a gun at a person.

The judgment is reversed. Since we find the evidence to support the wardship insufficient as a matter of law, further proceedings are barred by the double jeopardy clause. (U.S. Const., Fifth Amend.; *Burks* v. *United States* (1978) 437 U.S. 1, 10-11 [57 L.Ed.2d 1, 9, 98 S.Ct. 2141]; *In re Johnny G., supra,* 25 Cal.3d 543, 548-549.)

Hanson (P. D.), J., concurred.

CAETON, J.,* Concurring and Dissenting.—I agree that the judgment must be reversed for the reason the nature, quality and effect of the substances administered to this nine year old are unknown. In light of this omission, no one can say with any degree of certainty that there was a valid waiver or that appellant's admissions were voluntary.

I respectfully dissent from the remainder of the decision.

---

*Assigned by the Chairperson of the Judicial Council.