[Crim. No. 27962. Second Dist., Div. Five. Jan. 25, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
J. D. FARRIS, Defendant and Appellant.

**COUNSEL**

F. Elaine Easley, under appointment by the Court of Appeal, Paul N. Halvonik, State Public Defender, and Charles M. Sevilla, Chief Assistant State Public Defender, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**STEPHENS, J.**—Defendant and appellant, J. D. Farris, was charged by information with murder (count I, Pen. Code, § 187), assault with a deadly weapon (count II, Pen. Code, § 245, subd. (a)), robbery (count III, Pen. Code, § 211), and the use of a firearm in the commission of these offenses (Pen. Code, § 12022.5). Following a trial by jury, appellant was found guilty of second degree murder and of the use of a firearm in connection therewith, and not guilty as to the other offenses charged. Upon the entry of a judgment of conviction, the instant appeal was filed.

*Facts*

On August 13, 1974, in the early morning hours about 2:30 a.m., Mrs. Irma Wesson was walking westward down the sidewalk along Florence Avenue near a Goodyear tire and rubber plant in Los Angeles when a white van pulled up just ahead of her. A man emerged from the driver's side of the van and walked toward Mrs. Wesson. A struggle ensued as the man attempted to force Mrs. Wesson toward the van. The man struck Mrs. Wesson and the revolver in his hand discharged, mortally wounding her. Mrs. Wesson slumped to the sidewalk as the man reentered the van. The van disappeared around the corner, but a few minutes later returned to the point where Mrs. Wesson was lying and then departed at a high rate of speed.

The foregoing scene was witnessed in whole or in part by at least eleven persons—two deputy sheriffs, who were driving home from duty, six employees of the Goodyear Tire and Rubber Company who were on their lunch break, and appellant's three companions in the van. The events leading up to, and immediately following, the shooting will be related in chronological fashion from testimony adduced by the prosecution witnesses at trial.

On the afternoon of August 12, 1974, J. D. Farris and his nephew, Alexander Dickey, attended a barbeque at his brother-in-law's home.

Early that evening Farris became involved in an altercation with some of the guests and was asked to leave. This he did, but later that evening he returned and appropriated a .32 caliber revolver belonging to his brother-in-law, Mr. Roan. Again, appellant returned home.

At approximately 1:30 a.m., on the morning of August 13, 1974, appellant woke his nephew and asked him to go along to the store with him in his van. Outside the house they met Garry Nettles, a friend of appellant's, and Darryl Armelin, one of Nettles' friends. Appellant asked the two to accompany him, which they did. With appellant at the wheel, they first drove to a liquor store where they purchased some beer. Afterwards they proceeded over to Florence Avenue where they observed Mrs. Wesson walking down the sidewalk. Earlier a number of other persons had pulled their vehicles up alongside Mrs. Wesson in an effort to pick her up, but she had ignored their protestations. Appellant drove his white Ford van slowly alongside Mrs. Wesson, just in front of another vehicle, while Gary Nettles called out to her. Picking up the small handgun he had taken from Mr. Roan, appellant jumped out of the van and walked down the sidewalk to accost the woman. As the appellant was attempting to pull the woman towards the van, the gun discharged. Appellant quickly reentered the van from the passenger's side[1] and Nettles drove the van around the corner. At that point, Nettles changed positions with appellant, and appellant drove around the block past Mrs. Wesson and then sped off. When questioned about the incident, appellant explained to Nettles that the lady had slapped him, and that he in turn hit her, and the gun went off.

Following this incident, Dickey requested that his uncle take him home. Appellant dropped off his nephew, and then he, Nettles and Armelin continued on to Tommy's a drive-in restaurant on Imperial Highway, where the three of them ate. Shortly after they left, they were stopped by sheriff's officers and arrested on suspicion of murder. At the time of the arrest, the handgun belonging to Mr. Roan was found on the step just below the right front passenger seat. Two live rounds and one spent casing were later discovered in the revolver.

---

[1]There is some conflict in testimony among the six Goodyear employees as to which side of the van the assailant entered. Two of the witnesses thought they saw the person run around to the driver's side of the van, while one claimed that the man ran back toward the passenger's side of the van. Deputy Sheriff Gordon, who observed the incident at close hand, testified, however, that the woman's assailant was in the passenger's seat, while a younger black male drove the van away from the scene. All of the Goodyear employees agreed, however, that the assailant had gotten out of the van on the driver's side.

After the three suspects were taken to the station, they were each questioned about the shooting. Appellant was advised of his rights and was then interrogated by two officers—Sergeant Lamberty and Detective Lees. When asked to account for his activities early that morning appellant told Lamberty that he and his two companions had driven around awhile, went to a Tommy's hamburger stand for about 30 minutes and were then arrested as they were driving away. The appellant denied killing anyone, but admitted that he had gotten the gun from Mr. Roan, and that he alone had used his van in the preceding 24 hours.

On the stand, appellant denied having gotten out of the van himself, but instead pointed to Mr. Nettles as the aggressor. It was Nettles, he claimed, who had driven the van up to Mrs. Wesson, and who had then exited the vehicle to accost the woman.[2] In support of this version of events, the defense put a cellmate of Nettles' on the stand, who testified essentially that Nettles had told him that appellant was innocent, but that he was forcing appellant's nephew to testify against appellant.

## Contentions

The appellant makes the following four contentions in support of a reversal of his conviction: First, that the evidence adduced at trial is insufficient to sustain a conviction; second, that the district attorney knowingly used false testimony in order to secure the conviction, denying him due process of law; third, that the trial judge improperly dismissed a juror during the course of the trial; and fourth, that the prosecution denied him due process of law and was guilty of misconduct in questioning him about his post-arrest silence.

## Discussion

### I

■ According to fundamental principles of appellate review, this court must assume the existence of every fact in support of a judgment that can reasonably be deduced from the evidence. (E.g., *People* v. *Reilly*, 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649].) ■ A

[2]The appellant testified that Darryl Armelin had also gotten out of the van, but that Nettles had reentered the van with the gun and admitted shooting Mrs. Wesson. He also stated that he drove the van away after Nettles had reentered through the passenger door, and that although they did go around the block they did not go back past the spot where the victim was lying but instead departed in the opposite direction along Florence Avenue.

judgment of conviction can only be overturned if it is determined that no reasonable trier of fact could have found that the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt. (See, e.g., *People* v. *Bassett,* 69 Cal.2d 122, 139 [70 Cal.Rptr. 193, 443 P.2d 777].) In making this determination, we need only ascertain whether the record contains any "substantial evidence" supporting a conviction—that is, evidence of "substantial probative value" or evidence "reasonably inspiring confidence." (*In re Roderick P.,* 7 Cal.3d 801, 808-809 [103 Cal.Rptr. 425, 500 P.2d 1].)

■ Appellant seems to argue that the evidence against him is insufficient to support the conviction because inferences drawn from certain testimony support appellant's version of the killing, and because the adverse testimony given by appellant's three companions is lacking in credibility. He points out that Nettles must have been the person who got out of the van since Nettles admitted communicating with the victim, and therefore was more likely to have actually accosted Mrs. Wesson. Furthermore, appellant claims that the observations of several of the witnesses from the Goodyear plant points more strongly to Nettles as the assailant.[3] Finally, the testimony of Mr. Armelin and Mr. Dickey is discredited as fabrication. Armelin's testimony is attacked because of the conflicting stories given to the police and to the court at the preliminary examination, and because his friendship with Nettles gave him reason to cover up for Nettles. Dickey's testimony is explained as having been fabricated out of fear of Nettles, and out of a desire to satisfy the district attorney who had promised him plane fare home to Texas.

Appellant's strained reading of the record does not warrant a reversal of his conviction. Simply because inferences drawn from the evidence are consistent with innocence does not mandate that a judgment of conviction be set aside. " ' "Few criminals would ever be convicted if their explanations were accepted as gospel truth." ' " (*People* v. *Carlson,* 177 Cal.App.2d 201, 204 [2 Cal.Rptr. 117].) ■ It was for the jury to sift the true from the false and to determine the weight and credibility to be assigned to a witness' testimony. (*People* v. *Ashley,* 42 Cal.2d 246, 266 [267 P.2d 271].) ■ The test on appeal is not whether there are inferences to be drawn for the defense, but whether the evidence is

[3]Two of these six witnesses thought that the woman's assailant was wearing dark clothing. Nettles was wearing dark clothing at the time of the arrest; appellant was wearing blue jeans and a light blue T-shirt. One of those two witnesses felt that the assailant was approximately the same build and height as the victim. Nettles matched that description more closely than appellant.

sufficient to sustain the conviction (see *People* v. *Nabayan,* 276 Cal.App.2d 361, 366 [80 Cal.Rptr. 779]), and the evidence in the case at bench is not only sufficient, it is overwhelming. The three individuals who accompanied appellant in his van the morning of the killing—Nettles, Armelin and Dickey—all testified that appellant drove the van to the scene of the crime, that he had a gun, that he exited the van and a shot was heard, and that he later admitted that he had struck the woman and that the gun had discharged. A deputy sheriff who had driven by the scene of the crime had distinguished appellant from Nettles, who was smaller and much younger than the appellant, as the woman's assailant. Appellant had admitted getting the murder weapon from his brother-in-law, and had also admitted owning the white Ford van, and being the sole driver of the vehicle during the 24-hour period preceding his arrest. Testimony of the witnesses from the Goodyear plant established that the driver of the van had gotten out of the van to confront Mrs. Wesson on the sidewalk. All of the foregoing prosecution testimony paints a fairly damning picture of guilt. We cannot say that the jury acted unreasonably in finding, beyond a reasonable doubt, that the picture was accurate.

## II

■ ▪ The appellant's claim, that the district attorney denied him a fair trial by knowingly using false testimony, is without merit. ■ While it is true that a conviction knowingly obtained through the use of false testimony cannot be upheld (*People* v. *Westmoreland,* 58 Cal.App.3d 32, 42 [129 Cal.Rptr. 554]), it must first be shown by a preponderance of the evidence that the testimony was in fact *untrue,* and that the prosecution was aware of its falsity (*People* v. *Gordon,* 10 Cal.3d 460, 473 [110 Cal.Rptr. 906, 516 P.2d 298]).

■ The testimony under attack is that of Elisandro Acosta, an investigator for the district attorney, who had been called to rebut the testimony of Reginald Jackson. As a part of appellant's defense, Jackson had been called to testify to certain inculpatory remarks made to him by Gary Nettles while they were in a county holding cell together. According to Jackson, Nettles had said that the appellant was innocent, and that he had told a Crip[4] friend of his to tell the appellant's nephew that if he didn't testify as he said, he would kill him. Acosta explained on the stand, however, that Jackson had only told him that Nettles had said that he had heard from a "dude" who had heard from another "dude" that if appellant's nephew didn't testify in a certain way that the

---

[4]The "Crip" is a black Los Angeles gang.

nephew's family would be hurt. In surrebuttal, Jackson's attorney, Charles Maple, who had been present during part of his client's talk with Acosta, testified that Jackson had related Nettles' remarks to Acosta in the same manner in which he related them on the stand earlier.

The core of appellant's argument is that because Maple's testimony was contradictory to Acosta's testimony, and because Maple was a disinterested witness, Acosta must have lied, and further, the prosecution must have known that the testimony was false. Such a claim is specious. The mere fact that the statement of a witness is later contradicted by an opposing witness does not establish that the first witness' testimony was perjured, let alone that the prosecution was aware of its falsity, even if testimony of the latter witness may appear more reliable. (See *People* v. *Gordon, supra,* at p. 474.) In fact, there was even evidence tending to show that the conflict in testimony may have been due to error on the part of Mr. Maple in recalling the exact conversation. Thus, the appellant has failed to meet the requisite burden of proof in establishing the knowing use of perjured testimony, and the presentation of Mr. Acosta's testimony cannot have deprived the appellant of a fair trial.

### III

Appellant argues that the trial court committed prejudicial error in dismissing one of the jurors during the trial. This particular juror had been absent from court on August 4, 1975, as he was in custody on a felony charge. As a result of this absence, and another on August 7, 1975, an extensive hearing was held to determine his capacity to continue on the jury panel. This hearing revealed that, aside from the juror's current felony charge, the juror was being prosecuted on two other misdemeanor charges, and had an extensive arrest record. Moreover, it was discovered that, on voir dire, the juror's current and past involvement with law enforcement had deliberately been concealed. In spite of the fact that the juror insisted that he could remain fair and impartial in the present matter, the court excused him from the jury and swore in the last alternate juror. Appellant labels the court's action as prejudicial error, contending that the court exceeded its discretion under sections 1089 and 1123 of the Penal Code to dismiss a juror for "good cause." In particular, appellant claims that nothing automatically excludes a person charged with a felony from serving on a jury, especially where the juror insists that he can execute his functions with impartiality. We uphold the propriety of the court's discharge of this juror, and therefore need not reach appellant's argument as to the prejudicial effect of the juror's dismissal.

Sections 1089 and 1123 of the Penal Code[5] authorize the court to discharge a juror before the jury returns its verdict if "[t]he juror becomes sick *or upon other good cause shown is found to be unable to perform his duty . . . ."* (Italics added.) ■ A determination of "good cause" in this context is one calling for the exercise of the court's discretion (e.g., *People* v. *Manriquez,* 59 Cal.App.3d 426, 431 [130 Cal.Rptr. 585]), and if there is any substantial evidence supporting that decision, it will be upheld on appeal (see *id.,* at pp. 431-432). ■ A juror's duty is to weigh the evidence and credibility of witnesses and to reach a verdict with impartiality. (See Code Civ. Proc., § 604; *People* v. *Compton,* 6 Cal.3d 55, 59-60 [98 Cal.Rptr. 217, 490 P.2d 537].) ■ If at any time during the trial the juror loses the ability to render a fair and unbiased verdict, he can, under section 1123 of the Penal Code, be dismissed from the case. But the juror's inability to perform his functions must appear as a "demonstrable reality"; bias cannot be presumed. (See *People* v. *Compton, supra,* at p. 60.) ■ Nevertheless, even though a juror may claim he can be impartial, he can still be properly excluded from the case if there are so many factors weighing against this possibility, that neither he, nor any other person similarly situated, could render a fair and unbiased decision.

■ Pursuant to the foregoing guidelines we feel that "good cause" was amply demonstrated supporting the dismissal of the juror in the instant case. The nature and extent of the current criminal charges against this juror, and his past criminal activity, together with the attitudes evinced toward the police, make it clear that he could not have been the impartial arbiter that he claimed he could be. The juror had indicated that he felt that the charges against him were "illegitimate" when asked why he had concealed his past and present entanglement with law enforcement on voir dire. Furthermore, he had stated that he felt that a search of his home by police in connection with one of the charges against him had been unreasonable. The current charges against the juror included one felony—offering marijuana to a minor (Health & Saf. Code, § 11361), and two unrelated misdemeanor charges. His past record included convictions on a variety of misdemeanor charges. In

---

[5]These sections provide, in pertinent part, as follows:

"If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his duty, or if a juror requests a discharge and good cause appears therefor, the court may order him to be discharged and draw the name of an alternate. . . ." (Pen. Code, § 1089.)

"If before the jury has returned its verdict into court, a juror becomes sick, or upon other good cause shown to the court is found to be unable to perform his duty, the court may order him to be discharged." (Pen. Code, § 1123.)

light of this evidence, the juror's insistence upon his ability to remain impartial toward law enforcement cannot be given much weight. (Cf. *In re Devlin,* 139 Cal.App.2d 810, 813 [294 P.2d 466].)[6] Moreover, the deliberate concealment by this juror of his past and present scrapes with the law, knowing that he would otherwise be subject to dismissal from the jury panel,[7] is another factor evidencing his unfitness to serve as a juror. From the totality of these circumstances, we conclude that the trial judge properly exercised his discretion in excusing this juror pursuant to Penal Code sections 1089 and 1123.

## IV

Appellant relying on *Doyle* v. *Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240], argues that certain questions asked of him on the stand, relating to his post-arrest silence, constituted a denial of due process as well as prosecutorial misconduct. We disagree with appellant that such questioning on cross-examination was error under *Doyle.*

In *Doyle* v. *Ohio,* the defendant was charged with the sale of marijuana. Following his arrest, he was given *Miranda* warnings, and *exercised his right* to remain silent. At trial, the defendant claimed that he only tried to *purchase* the marijuana, but that the disgruntled seller had attempted to pin the blame on him. On cross-examination, the defendant was asked: "[I]f that is all you had to do with this and you are innocent, when Mr. Brenner [the narcotics agent] arrived on the scene why didn't you tell him?" The Supreme Court held that the use, for impeachment purposes of defendant's silence at the time of arrest, after the defendant received *Miranda* warnings, violated the due process clause of the Fourteenth Amendment. (426 U.S. 610, 619 [49 L.Ed.2d 91, 98].) The court reasoned that there is an assurance implicit to any person receiving the *Miranda* warnings that silence will carry no penalty, and that it is fundamentally unfair to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial. (*Id.*) In answer to a criticism by the dissent, the court explained that, "[a]fter an arrested person is formally advised by an officer of the law that he has a right to remain silent, the unfairness occurs when the prosecution, in the presence of the jury, is allowed to undertake impeachment on the basis

---

[6]In *Devlin, supra,* the juror had been arrested on a felony charge and had *asked* that he be removed from the jury panel as he felt that he could no longer perform his duties fairly. The discharge of this juror was upheld on appeal.

[7]The juror had been excluded from the jury in a prior case when he admitted his arrest for a misdemeanor narcotics offense.

of what may be the exercise of that right" thus "implying an inconsistency that the jury might construe as evidence of guilt." (*Id.*, at p. 98, fn. 10 [49 L.Ed.2d at p. 98].)

 In the case at bench the appellant had been advised of his rights, but had waived them. He then made several statements to police officers. After the statements had been made, when one of the officers commenced to take a written statement from him, appellant indicated that he wished to conclude his conversation, and then asked to see an attorney. Up to that point, appellant had admitted that he was the only person who had used his van in the preceding 24 hours, and that the gun found in the van had been given to him by a friend and that he, Nettles and Armelin had driven around awhile in his van, and then gone to a drive-in restaurant before being arrested. On the stand, faced with the adverse testimony of Nettles, Armelin and Dickey, appellant claimed that it was Nettles, and not he, who had driven the van up Florence Avenue, and who had gotten out of the van to accost the woman. On cross-examination, the following colloquy occurred between the prosecutor and appellant:

(1) "Q Well, let me ask it to you for the fourth time: On the 13th of August you had reason to believe that Nettles had killed a woman?

"A Yes.

(2) "Q All right. *What did you do between the 13th of August and now to see to it that information about Nettles killing the woman would be brought to the attention of law enforcement?*

"[Objection.]

"· · · · · · · · · · · · · · · ·

(3) "Q *Didn't you tell Officer Lamberty, 'Hey, man, you got the wrong guy. Nettles shot the woman'?*

"A No, I never told him that.

(4) "Q *And didn't you tell him, 'Hey, the two guys that are responsible are Nettles and Armelin. They are the two guys that got out of the van.'* You didn't tell him that?

"A No, I didn't.

(5) "Q You let yourself sit in jail until the time of the preliminary hearing, right? Isn't that right?

"[Objection; — sustained.]

" . . . . . . . . . . . . . . . .

(6) "Q *Didn't you call and get yourself a detective and say, 'Hey Mr. Detective, you have got the wrong man'?*

"[Objection; — sustained.]

" . . . . . . . . . . . . . . . .

(7) "Q *What police officers did you tell . . . that Armelin and Nettles got out of the van?*

"[Objection; — sustained.]

" . . . . . . . . . . . . . . . .

(8) "Q *Who did you tell before the preliminary hearing that Armelin and Nettles were the people that got out of the van?*

"[Objection; — sustained.]

(9) "Q No one? You told no one before the preliminary hearing that Armelin and Nettles were the people that got out of that van?

"A I don't remember if I told my attorney or not.

(10) "Q You don't remember if you told your attorney?

"A (No audible response)

(11) "Q Is that what you're telling the jury?

"[Objection; — sustained.]" (Italics added.)

Appellant contends that the bar on impeachment questioning raised by *Doyle* applies with equal force here, even though he may have first spoken to police after being advised of his rights, as long as he has not

made any statement concerning the circumstances of the crime with which he was charged. The fundamental principle in *Doyle* is that while statements made to police can be used against an arrestee, the *Miranda* warnings imply that his silence at the outset of questioning will carry no penalty. Here, the appellant, in apparent reliance upon his *Miranda* rights, had clearly asserted his right to remain silent in the face of further questioning, and also requested the assistance of an attorney. The question here is whether the initial voluntary statements were of such nature as to open the door to the prosecution's cross-examination. With the possible exception of four of the questions[8] the cross-examination was within bounds and violated no due process rights. The door to cross-examination as to why Nettles was not initially named was within the scope of the statement of activity and the denial of responsibility in the killing given before appellant asserted his right to silence. As to the referred to four questions, the error could have had no effect upon the verdict and was harmless beyond a reasonable doubt. (*Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].) Any impact of the four questions had been ameliorated by the sustaining of objections to three of them and by the limiting instruction given at appellant's request.[9] Also, considering the posture of the defense, predicated solely on appellant's story, no "evidentiary gap" was filled nor was a "live nerve in the defense" touched. (See *People* v. *Modesto,* 66 Cal.2d 695, 714 [59 Cal.Rptr. 124, 427 P.2d 788].)

The judgment is affirmed.

Kaus, P. J., and Ashby, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 21, 1977.

[8]For convenience, we have numbered the questions. The four referred to are numbered 2, 5, 9 and 10.

[9]In pertinent part, this instruction provided: "After a defendant has been advised of his rights . . ., his failure to discuss the facts of his case with anyone other than his attorneys or explain or deny evidence against him before he testifies in his own defense during the trial does not create a presumption of guilt, or an inference of guilt, nor does it relieve the prosecution of its burden of proving every essential element of the crime and defendant's guilt beyond a reasonable doubt."