William PACKER, Petitioner–
Appellant,

v.

Don HILL, Warden; Attorney General
of the State of California,
Respondents–Appellees.

No. 00–57051.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 8, 2001.

Filed Jan. 15, 2002.

Amended Feb. 27, 2002.

Second Amendment May 6, 2002.

Elizabeth Newman, Los Angeles, CA (argued) and Monica Knox, La Crescenta, CA (brief), for the petitioner-appellant.

Kenneth N. Sokoler, Deputy Attorney General, Los Angeles, CA, for the respondents-appellees.

Before PREGERSON, REINHARDT, and SILVERMAN, Circuit Judges.

### ORDER

Petitioner–Appellant William Packer's request for clarification of the remand order is granted. The opinion filed January 15, 2002 [277 F.3d 1092] is amended as follows:

1. On the second line from the bottom of slip opinion 644 [277 F.3d at 1095], "returned verdicts" should be replaced with "returned sealed verdict forms to the court."

2. The third and fourth sentences of the first full paragraph of slip opinion page 663 [277 F.3d at 1105] should be deleted and replaced with the following (including footnote 16):

 Because the jury was considering both the murder and attempted murder counts when this coercion occurred, we conclude that the judge's coercion manifestly had a "substantial and injurious effect" on the jury's verdicts on these counts. *Brecht*, 507 U.S. at 637, 113 S.Ct. 1710, 123 L.Ed.2d 353.[16] We therefore reverse the district court's denial of the writ of habeas corpus and remand with instructions to grant the writ as to Packer's murder and attempted murder convictions.

3. On slip opinion page 665 [277 F.3d at 1105], the remainder of the ma-jority opinion below the heading "Conclusion" should be deleted and replaced with the following:

 While we agree with the district court's rejection of Packer's leg brace claim, we reverse its decision to deny the writ of habeas corpus with respect to the murder and attempted murder convictions, because we uphold Packer's juror coercion claim as to those counts. As to the remaining counts on which Packer was convicted, we affirm the denial of the writ. Accordingly, we remand to the district court for the granting of an appropriate writ of habeas corpus on the murder and attempted murder counts.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

### OPINION

PREGERSON, Circuit Judge.

In 1992, a California state jury convicted William Packer ("Packer") of one count of second degree murder, one count of attempted murder, two counts of attempted robbery, two counts of assault with a deadly weapon, and one count of assault with a firearm. The jury acquitted Packer on ten other counts.

After exhausting his claims in state court,[1] Packer timely filed a federal habeas corpus petition. Magistrate Judge Margaret Nagle prepared a report ("Report") recommending that Packer's petition be denied. District Judge Harry L. Hupp adopted Magistrate Judge Nagle's Report, but granted Packer a certificate of appealability on two of Packer's claims: that the state trial judge violated his Fourteenth Amendment right to due process by coercing the jury into rendering a guilty verdict, and that the state trial judge violated Packer's Sixth and Fourteenth Amend-

---

**1.** See Section II.A, *infra.*

ment rights by ordering him to wear a concealed leg brace at trial that caused Packer pain and prevented him from straightening his leg. Because we hold for Packer on the first claim, we reverse the district court and remand with instructions to grant the writ of habeas corpus.[2]

## I. Background

### A. Juror Coercion Claim

■■■ On May 12, 1992, after over twenty hours of deliberation, and after the jury had returned sealed verdict forms to the court on all but the murder and attempted murder charges, Juror Eve Radcliff ("Juror Radcliff") wrote the judge, asking to be dismissed "[d]ue to health problems." Judge Phelps and Juror Radcliff then met outside the presence of the defendant and the attorneys. The following conversation ensued:

> Radcliff: Well, since I wrote that letter I have been thinking over things a little bit and I think maybe I should— see, these are some very serious charges.
>
> Judge: They certainly are. I don't want to know how they been voted on. I don't want to know how they been voted on.
>
> Radcliff: Certainly not, your Honor. But I can't—because of the seriousness of the charges, I can't make snap decisions. And just as in your instructions you stated to us certain

things to practice in deliberations. I was beginning to feel a little burned out.

> Judge: We all are.
>
> Radcliff: Yeah.

. . . .

> Judge: [Y]ou are going to take off Thursday and we're going to allow that. So you think you can hold out just a little bit longer?
>
> Radcliff: Yes.
>
> Judge: I really appreciate it. *Otherwise, they have to start deliberations all over again with another person.*[3]
>
> Radcliff: That's what I understand.

(Emphasis supplied).

The next day, May 13, Judge Phelps received a note from the jury foreman, Richard Wyke ("Foreman Wyke"). Foreman Wyke wrote:

> I believe we have reached a state where we can no longer deliberate. One juror, Eve Radcliff, does not appear to be able to understand the rules as given by you. I have been approached by nearly all my fellow jurors questioning her ability to understand the rules and her ability to reason. I feel that if we continue we will end up as a hung jury, not based on facts and evidence, but one person's inability to reason or desire to be unreasonable.

Judge Phelps read the note aloud in open court, in the presence of the attorneys, the

---

**2.** We review a district court's decision to dismiss a petition for writ of habeas corpus de novo. *Miles v. Prunty*, 187 F.3d 1104, 1105 (9th Cir.1999).

**3.** California law allows for the substitution of an alternate juror after a verdict has been reached on some but not all of the counts, provided that the trial court instructs the panel to begin deliberations anew on the remaining counts. *People v. Aikens*, 207 Cal.App.3d 209, 211, 254 Cal.Rptr. 30 (1988). A juror

can be substituted if he or she becomes sick, or for other "good cause," including the juror's inability to render a fair and unbiased verdict. *People v. Delamora*, 48 Cal.App.4th 1850, 1855, 56 Cal.Rptr.2d 382 (1996) (jurors cannot be excused if they are not ill or otherwise unable to perform their duties); *People v. Farris*, 66 Cal.App.3d 376, 386, 136 Cal.Rptr. 45 (1977) ("good cause" is shown if the juror is unable to "render a fair and unbiased decision").

defendant, and all of the jurors. Judge Phelps then asked Foreman Wyke whether the jury was deliberating. Wyke responded that they were "just having the same conversation over the same issue time and time again." Judge Phelps asked whether the dispute was factual. Wyke responded that "[i]t basically comes down to there's a point where the rules of law, or as has been described, we just have a total difference of opinion over. I think we have a state of denial almost where its just not happening." Judge Phelps then explained:

> The juror has a right to do that, as you all know. They have a right to disagree with everybody else. But they do not have a right to not deliberate. They must deliberate and follow the rules and laws as I state it to them.

After more discussion, Judge Phelps said:

> Judge: The next question I have for you, I just want two numbers and that's all. I want to know nothing else but two numbers. I'll ask you this. In your last ballot what was the ballot? *What was the count? Don't tell me for or against, just numbers.*
>
> Wyke: I know. The last one was 11 to 1.
>
> Judge: 11 to 1.
>
> Judge: The one before that was 10 and 2.
>
> Judge: *Do you think that further deliberations might help.* I think you're off tomorrow, are you not?
>
> Wyke: Yes.
>
> Judge: *Do you think if you take off now and come back Friday you might be able to make further progress?* . . . .
>
> Wyke: It comes down to interpreting.
>
> Judge: It's been a long time for you people.
>
> Wyke: Yes. We are getting tired of each other. It comes down to interpreting

the laws as given to us, and if one person's interpretation is inflexible in their view, I don't know that it will do us any good.

> Radcliff: Or different.
>
> Judge: *Has the person been deliberating?* And discussing—
>
> Wyke: *Yes. I'm not questioning that.* We might give it a shot and come back Friday morning. If it continues we are going to be hung.
>
> Judge: If you do that, then *what you're saying to me is there's a possibility you could reach a verdict, but let's take a little time off. That might help? I don't think it would hurt.*

(Emphasis supplied). Jurors then began asking questions about the deliberative process and the following conversation ensued:

> Radcliff: Was there something regarding morals in the instructions that you gave us?
>
> Judge: I don't think so. No.
>
> Radcliff: You cannot give us an interpretation of the law.
>
> Judge: No. I cannot do that.
>
> Radcliff: It's up to us individually to interpret the law and apply it.
>
> Judge: What you do is—like I think what the instructions were—you apply the facts to the law and you arrive at a decision. *The law is right there,* and I think elements of the law was given to you in those instructions. They do this or not do this? Was it proven beyond a reasonable doubt? This element, this element, this element? If they did and you find unanimously they did that, you must follow the law and find them either guilty or not guilty of that charge.

(Emphasis supplied). At this point, defense counsel objected and, in a side bar, said that Judge Phelps was misstating the

instructions and improperly "instructing the jury ... as to their manner of deliberation." Defense counsel then asked that Judge Phelps instruct the jury only that they are "to follow the law as I give it to you and to refrain from explaining further what that instruction might mean in practice." The prosecutor offered that Juror Radcliff's comments reflected that she was not going to follow the law. Judge Phelps overruled defense counsel's objection and instructed the jury as follows:

Ladies and Gentlemen, the only thing I'm going to tell you right now is; once again, I told you, you'll look up in the instructions paraphrasing it, I think I'm using the correct words: you're the sole judges of the facts. You determine the facts. You then apply the law to those facts as I state it to you, and you must accept and follow the law. You can't make up your own law. You must accept and follow the law as I state it to you.

Judge Phelps then excused the jury until Friday.

On Friday, May 15, the jury continued its deliberations. That afternoon, Juror Radcliff submitted a second letter to Judge Phelps that read:

Due to the public beating in the jury box I experienced Wednesday, and the beatings I experience in the deliberation room from other jurors, I am again submitting a request to be dismissed from continuing on this jury.

I now am struggling with a feeling of distrust and disrespect from the other jurors, borne out of the letter that was submitted to you, regarding my so-called "refusal" to accept or agree with the other jurors' thinking.

I did not know *anything* about the letter that the other jurors/foreman submitted to you regarding me. As I result I find it difficult to continue in deliberations. Respectfully submitted, Eve Radcliff 6613

P.S. Though the proceedings have improved in their nature, I have reached a point of anger, and I don't believe I can be objective.

(Emphasis in original). After reading Juror Radcliff's second letter to the attorneys in chambers, defense counsel stated that Radcliff was "being driven off the jury." Judge Phelps informed counsel that he was going to call Juror Radcliff into chambers. Defense counsel objected to Judge Phelps's decision to call Juror Radcliff into chambers.[4] Defense counsel said:

Let me—just so I can get my record clear. Let me say that I—also *I object to this procedure.* I feel what's happening is that *Miss Radcliff is being singled out. And it's more pressure on her to either change her vote or be excused. And I think this is the process that causes that.* This causes somebody— especially when she is going to come into chambers with just the court and counsel, puts her in a very difficult position.

When Juror Radcliff was brought into chambers, she said a "personality ething" was affecting deliberations. As she explained:

*I didn't know about the letter that they submitted to you until like a minute and a half before we went out in the box.* And then when it was read, it sounded to me like they wanted—the intent was for me—they were upset because I

---

**4.** Defense counsel additionally argued that Packer would be denied a jury drawn from a fair cross-section of the community were Juror Radcliff excused because she was one of two black people on the jury.

didn't—I wasn't—okay. I think if I recall correctly something like, refuses to understand our thinking, or refuses to accept our line of reasoning, or refuses to accept the law. I think that's what they said or something like that. And I took that to mean that things weren't going the way that they were supposed to go, because at that point I was giving them responses, you know. *We were deliberating, I thought, but they felt that they weren't getting from me the type of responses that they wanted* because I didn't see what they were saying . . . .

(Emphasis supplied). After Judge Phelps asked Juror Radcliff whether she was continuing to deliberate, she explained that she was trying, but said "[i]t's not to their satisfaction, that's what part of the problem is." Judge Phelps said: "Two weeks is a long, long time, it is, and I appreciate that. Okay. I think I understand. Thank you very much." Juror Radcliff returned to the jury room.

Judge Phelps then called in Foreman Wyke to meet with him and the attorneys. Judge Phelps asked Wyke: "is the position that you have reached in your deliberations that you can't go any further or do you think that—how do you feel about it?" Wyke explained their current deliberations process and repeatedly confirmed that Juror Radcliff was continuing to deliberate. Wyke was excused from Judge Phelps's chambers, and the jury continued to deliberate.

At the end of that day the jury was excused until Tuesday, May 19. On the morning of May 19, Juror Radcliff wrote Judge Phelps again, "requesting to speak with[the Judge] alone, in the presence of a court reporter only, if possible." Judge Phelps did not meet with Juror Radcliff.[5] The jury rendered a guilty verdict on the

attempted murder charge late in the afternoon of May 19, and was then excused for the day. Early in the morning of May 20, the jury rendered a guilty verdict on the murder charge.

## B. Leg Brace Claim

The day after the jury was sworn, the Sheriff's Department requested that Packer wear a leg brace underneath his pants during trial. The leg brace locked in a straight position when the wearer stood, was worn under one pant leg, and attached with velcro to the thigh and calf.

At the Sheriff's Department's request and over defense counsel's objection, Judge Phelps held an in camera hearing to review the evidence supporting the request. During the in camera hearing, Sergeant Fogerty and two Deputies, Leibrich and McCarthy, explained that they sought the leg brace because James "Doc" Holliday ("Holliday"), one of Packer's prospective witnesses, was a "very high security risk." Sergeant Fogerty explained, under oath:

> I received some information from Deputy Chaffin from the Security Unit yesterday that our Special Investigations Bureau has information that somebody connected with Holliday has said that when he gets to L.A., that stuff is going to happen. He's got nothing to lose. He wants out. He's a high escape risk.

Judge Phelps asked how this information applied to Packer. Deputy McCarthy explained, in an unsworn statement, that:

> James Holliday's wife has had communications with Packer, and that the information is that the communication between the two of them was: "I'll see you in Los Angeles, and that that's when its going to happen." Now, what we're try-

---

**5.** In another handwriting, at the bottom of the note, was written: "request cancelled at 9:25 a.m." It is unclear from the record who canceled the request.

ing to do now is establish exactly who the source is of that information, and that's the part that we don't want to disclose in court.[6]

Finally, the Sheriff's Department reported—during the in camera hearing and, at Judge Phelps's request, in open court—that they also sought a leg brace because Packer had a "special handling card" at the county jail, which was described as "a description of an inmate's possible potential problems of some sort," and because Packer had caused "some major disturbances" including "gang fights" while in custody.

Defense counsel countered that the only prison disturbance Packer had been involved in was in 1982, while Packer was in custody on another case, and that Packer was ultimately acquitted of charges arising out of that disturbance. Packer also testified in opposition to the use of the leg brace. Packer challenged the Sheriff's Department's characterization of his conduct while in custody and testified that, in his experience, restraints "definitely inhibit[ ] one's ability to function, to communicate . . . [, and] to concentrate."

Judge Phelps ordered Packer to wear the leg brace during trial. Judge Phelps found that the leg brace was necessary based upon testimony received at the in camera hearing and the testimony in open court, and concluded that the leg brace would not compromise the integrity of the proceedings. Judge Phelps explained:

> [T]he leg brace will not be visible to the jury; will not impede communications with his lawyer; will not detract from the dignity or the decorum of the judicial proceeding; will not be painful to the defendant; and would not be—he will be seated before the jury enters and

remain seated until the jury leaves. If the defendant chooses to take the stand, he'll be on the stand before the jury enters and remain on the stand until after the jury leaves.

As a result of the leg brace, Packer was required to remain seated at all times and was, therefore, unable to stand when the judge and jury entered the courtroom. Holliday was never called as a witness.

## II. Discussion

### A. Exhaustion

■ The State contends that Packer failed to exhaust his claims in state court. However, Packer's Petition for Review, though succinct, " 'fairly presented' . . . the 'substance' of his federal habeas corpus claim[s]" to the California Supreme Court. *Anderson v. Harless*, 459 U.S. 4, 6, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982) (quoting *Picard v. Connor*, 404 U.S. 270, 277–78, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)). Thus, the State's argument is without merit.

### B. Merits

**1. Packer's Fourteenth Amendment due process rights were violated because there is a strong likelihood that Judge Phelps's coercive statements and actions during the jury's deliberations caused Juror Radcliff to change her vote.**

■ A federal court may grant a writ of habeas corpus to a state prisoner only if the state court's rulings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or were "based on an unreasonable deter-

---

**6.** Deputy McCarthy's information is contradicted by Packer's undisputed declaration that Holliday's wife was in federal custody at the time the alleged "communication" occurred between Packer and Holliday's wife.

mination of the facts in light of the evidence presented" in the state courts.[7] 28 U.S.C. § 2254(d). Under the "contrary to" clause, a state court's decision is contrary to Federal law if it "failed to apply the correct controlling authority from the Supreme Court." *Shackleford v. Hubbard,* 234 F.3d 1072, 1077 (9th Cir.2000); *see also Williams v. Taylor,* 529 U.S. 362, 405–07, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *LaJoie v. Thompson,* 217 F.3d 663, 667 (9th Cir.2000); *Van Tran v. Lindsey,* 212 F.3d 1143, 1150 (9th Cir.2000).

■■■■ Here, Packer's juror coercion claim is governed by Federal law first set forth in *Jenkins v. United States,* 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965) and expanded upon in *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).[8] Coercive statements from the judge to the jury result in a denial of the defendant's right to a fair trial and an impartial jury. *Lowenfield,* 484 U.S. at 241, 108 S.Ct. 546. In order to determine whether the judge's comments were impermissibly coercive, the court must evaluate them "in [their] context and under all the circumstances." *Id.* at 237, 108 S.Ct. 546 (quoting *Jenkins,* 380 U.S. at 446, 85 S.Ct. 1059). The fact that Supreme Court law sets forth a fact-intensive inquiry to determine the extent of the statements' coerciveness "obviates neither the clarity of the rule nor the extent to which the rule must be seen as 'established' by this Court." *Williams,* 529 U.S. at 391, 120 S.Ct. 1495 (stating this in regard to *Strickland's* case-by-case approach); *see also Fisher v. Roe,* 263 F.3d

906, 914 (9th Cir.2001) (holding Supreme Court law "clearly established" because Supreme Court "set forth a working constitutional standard by which to evaluate [the claim at issue]"). Therefore, the applicable legal principles prohibiting juror coercion and the framework of the totality of circumstances test were "clearly established" for purposes of § 2254(d)(1).

■■■■ Because the California Supreme Court denied petitioner's habeas petition without comment, we look to the last reasoned decision of a state court as the basis of the state court's judgment. *Shackleford v. Hubbard,* 234 F.3d 1072, 1079 n. 2 (9th Cir.2000); *see also Ylst v. Nunnemaker,* 501 U.S. 797, 803–04, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991). Here, the last reasoned decision of the state court, the California Court of Appeal's unpublished opinion,[9] failed to cite to any federal law, much less the controlling Supreme Court precedents. Moreover, the court failed to apply the totality of the circumstances test as required by *Lowenfield* and *Jenkins.* Rather than evaluating the totality of the circumstances under which the judge's actions and comments occurred, as required by *Lowenfield* and *Jenkins,* the California Court of Appeal simply mentioned three particular incidents in its analysis and considered each of them separately, finding no reversible error in any of the following: (1) Judge Phelps's statement to Juror Radcliff, at the May 12 conference in chambers, "that deliberations would have to begin anew if [Radcliff] were excused"; (2) Judge Phelps's failure to further clarify the law in light of the instructions given on

---

7. Packer's petition is governed by the standards of 28 U.S.C § 2254 because his habeas petition was filed after the effective date of the Anti–Terrorism and Effective Death Penalty Act, the statute which enacted the current standards governing the granting of the writ of habeas corpus.

8. *See also Brasfield v. United States,* 272 U.S. 448, 47 S.Ct. 135, 71 L.Ed. 345 (1926); *Burton v. United States,* 196 U.S. 283, 25 S.Ct. 243, 49 L.Ed. 482 (1905).

9. *See People v. Jordan, et al.,* No. A958712 (Ca. Ct.App. filed Apr. 13, 1995).

May 12; or (3) Judge Phelps's "urging the jury to consider the matter further with the view to reaching an agreement" on May 13. The California Court of Appeal failed to consider the cumulative impact of these three incidents, as well as the cumulative effect of several other coercive judicial actions and statements in this case.[10]

■ In addition to failing to apply controlling Supreme Court law, the state court made an explicit statement of law that is contrary to Supreme Court precedent. The California Court of Appeal stated that "there is nothing improper in urging the jury to consider [a case] further with the view to reaching an agreement as long as the language used does not coerce a particular type of verdict." However, the Supreme Court has held a judge's instructions to be coercive simply because it coerced *a* verdict. The error lies in simply pressuring the jurors to arrive at *some* verdict, not in urging the jury to reach a particular verdict. *See Gypsum Co.*, 438 U.S. at 461, 98 S.Ct. 2864 (holding reversible error when judge implied that he wanted the jury to reach a verdict "one way or the other"); *Jenkins*, 380 U.S. at 446, 85 S.Ct. 1059 (holding reversible error when judge told the jury, "you have got to reach a decision in this case"). Thus, the

state court's decision was contrary to clearly established Supreme Court law, not only because it failed to apply the governing law, but also because its partial rationale directly contradicted Supreme Court precedent.[11] *See Campbell v. Rice*, 265 F.3d 878, 889–90 (9th Cir.2001); *Lockhart v. Terhune*, 250 F.3d 1223, 1229, 1232 (9th Cir.2001); *Shackleford*, 234 F.3d at 1078; *McClain v. Prunty*, 217 F.3d 1209, 1223 (9th Cir.2000).

■ However, the petitioner is not entitled to habeas relief unless the California Court of Appeal both failed to apply clearly established Supreme Court law and reached an erroneous result that warrants the issuance of a writ. *See Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Given our conclusion that the state court failed to apply clearly established Federal law, we must now determine whether its decision constituted error and if so whether the error had a substantial or injurious effect on the verdict. *See id.* Our first task is to look to Supreme Court case law and our own cases (and in appropriate instances those of other circuits), and apply them in the ordinary course.[12] In the case before us, our analysis of the applicable federal law

---

10. Significantly, the court does not even mention in its analysis that Judge Phelps inquired about the breakdown of the jury and, after learning that it was first ten to two and then eleven to one, directed the jury to return to its deliberations. *See Lowenfield*, 484 U.S. at 239–41; *Brasfield v. United States*, 272 U.S. 448, 449, 47 S.Ct. 135, 71 L.Ed. 345 (1926); *Burton v. United States*, 196 U.S. 283, 307, 25 S.Ct. 243, 49 L.Ed. 482 (1905). The state court also failed to consider the following critical facts: (1) Judge Phelps knew that Radcliff was the sole dissenting juror prior to his instructing the jury to keep deliberating; and (2) Judge Phelps's action of reading the note from Foreman Wyke out loud in front of the jury and identifying juror Radcliff by name.

11. In fact, in this case the state court failed even to consider whether a federal constitutional violation occurred, as the petitioner had urged; instead it addressed only issues of state law.

12. Unlike in those post-ADEPA § 2254 cases in which the state court *applied* the controlling federal law but the petitioner urges that the application was unreasonable, here the state court *failed to apply* the controlling Federal law, and so the result it reached need not be clearly erroneous in order for a writ to issue; the fact that the result is erroneous is sufficient, so long as the *Brecht* standard is met.

compels us to conclude that the judge's statements were impermissibly coercive.

Applying Supreme Court law, we have found judges' comments to be unduly coercive and violative of defendants' due process rights in circumstances far less coercive than those present here. In *Jiminez v. Myers*, 40 F.3d 976 (9th Cir.1993), the trial judge met twice with a deadlocked jury. *Id.* at 978–79. In the first meeting, the judge asked how many votes had been taken, how the breakdown of the votes began and ended, and whether there had been any "movement." *Id.* at 979. After the foreman replied that there was "movement," the judge returned the jury to its deliberations. *Id.* After further deliberations, the jury met again with the judge and informed him that it was divided eleven to one. *Id.* The judge noted that there had been "substantial movement" and sent the jury back to deliberate. *Id.* Less than two hours later, the jury returned with a unanimous verdict. *Id.*

■ We concluded in *Jiminez* that the trial court's comments and conduct "amounted to giving the jury a de facto *Allen* charge."[13] *Id.* at 980. In support of this conclusion, we observed:

> In view of the disclosure after the second impasse that only one juror remained in the minority and the trial court's implicit approval of the "movement" toward unanimity, *the judge's instruction to continue deliberating until the end of the day sent a clear message that the jurors in the majority were to hold their position and persuade the single hold-out juror to join in a unanimous verdict,* and the hold-out juror was to cooperate in the movement toward unanimity.

*Id.* at 981 (emphasis supplied). Under these circumstances, we held, the judge's "failure to counter-balance the implication of its questions and comments by instructing the hold-out juror not to surrender his or her sincere convictions strongly supports the conclusion that the jury was impermissibly coerced to render a unanimous verdict." *Id.* (citation omitted).

■ Judge Phelps's comments on May 13 amount to a "de facto *Allen* charge." *Id.* Judge Phelps asked about the jury's breakdown, learned that it had been divided ten to two but was currently divided eleven to one, and said that he would send the jurors back to deliberate if the foreman thought that "further deliberations might help" or if the jury might be able "to make further progress." Like the trial judge's approving comments about "movement" in *Jiminez*, Judge Phelps's questions to Foreman Wyke about whether further deliberations might "help" the jury to "make further progress" can only be understood to suggest approval for the apparent goal of that "progress"—a unanimous verdict. As in *Jiminez*, Judge Phelps's comments sent "a clear message that the jurors in the majority were to hold their position and persuade the single hold-out juror to join in a unanimous verdict." *Id.*

Judge Phelps's "de facto *Allen* charge" was particularly coercive because he knew that Juror Radcliff was the lone hold-out juror and Radcliff knew that he knew she was the hold-out juror. When Judge Phelps made his comments, he had read Wyke's letter in open court and learned from Foreman Wyke that the jury breakdown was eleven to one. Under these circumstances, Judge Phelps's questions about whether further deliberations would "help" the jury to "make further prog-

---

**13.** An *Allen* charge "instructs the jurors to work towards unanimity and the minority to reexamine its views." *Jiminez,* 40 F.3d at 980.

ress," though directed to Foreman Wyke, "could only be read by [Radcliff] as being leveled at [her]." *United States v. Sae–Chua*, 725 F.2d 530, 532 (9th Cir.1984).

> [S]he could hardly escape reasoning that the judge was not likely to believe that [s]he could persuade the opposing eleven to adopt [her] position—a position the foreman had felt to be improperly taken; and that *[s]he, individually, was being urged by the judge to reconsider [her] vote.*

*Id.* (emphasis supplied). We have held that if a judge knows the numerical division of a jury and then gives an *Allen* charge, "reversal is necessary if the holdout jurors could interpret the charge as directed specifically at them—that is, if the judge knew which jurors were the holdouts and each holdout juror knew that the judge knew he was a holdout." *United States v. Ajiboye*, 961 F.2d 892, 894 (9th Cir.1992). Even though Judge Phelps did not actually give an *Allen* charge, his comments had the same meaning and effect, and therefore, the comparable circumstances present here merit the same findings of coercion and error: "[s]o long as the defendant has offered facts that fairly support an inference that jurors who did not agree with the majority felt pressure from the court to give up their conscientiously held beliefs in order to secure a verdict, we must proceed to the *Allen* charge analysis." *Weaver v. Thompson*, 197 F.3d 359, 365 (9th Cir.1999).

Judge Phelps's conduct during the May 13 conference was also coercive because it humiliated Juror Radcliff unnecessarily. Judge Phelps read Foreman Wyke's letter in open court, including its references to Juror Radcliff as a juror who "does not appear to be able to understand the rules," and about whom Wyke had been "approached by nearly all [his] fellow jurors questioning her ability to understand the rules and her ability to reason." As is evidenced by Juror Radcliff's May 15 note and her comments during the meeting in chambers with Judge Phelps and the attorneys, hearing Wyke's letter felt like a "public beating" that was intended to make her change her vote. Judge Phelps allowed this "public beating" to occur by reading Wyke's letter, unabridged, in open court, and without any attempt to lessen the impact of its ad hominem attacks of Juror Radcliff.

■ Under these circumstances, Judge Phelps's failure to give any counter-balancing instruction on or after May 13 strongly supports the conclusion that Juror Radcliff was coerced to change her vote.[14] Although Judge Phelps commented that "the juror" had a right "to disagree with everybody else" at the beginning of the conference on May 13, he immediately countered that she did not "have a right to not deliberate," told Radcliff that "[t]he law is right there" and she must "follow the law," and instructed the jurors that they "must accept and follow the law" and "can't make up [their] own law." Judge Phelps never reminded Radcliff or the other jurors of their obligation not to surrender their conscientiously held beliefs. Judge Phelps again failed to give a counter-balancing instruction on May 15, when he met with Juror Radcliff and the lawyers. A counter-balancing instruction would have been particularly appropriate under the circumstances of the meeting which, as defense counsel observed, "put[ ] her in a very difficult position," and was "more pressure on her to either change her vote or be

---

**14.** Judge Phelps did give a counter-balancing instruction in the instructions he gave *before* the jury began its deliberations.

excused." [15] Given the feelings of humiliation and pressure that Juror Radcliff expressed during the May 15 conference, a counter-balancing instruction would undoubtably have been welcomed.

■ The Supreme Court has instructed that, where the jury break down is eleven to one, "the most extreme care and caution [are] necessary in order that the legal rights of the defendant should be preserved." *Burton v. United States*, 196 U.S. 283, 307, 25 S.Ct. 243, 49 L.Ed. 482 (1905). Judge Phelps did not exercise the care and caution required to preserve Packer's due process rights. One day after Judge Phelps had encouraged Juror Radcliff to remain on the jury despite her request to be excused, Judge Phelps read Foreman Wyke's letter in open court, in which Wyke described Radcliff as a juror who was unable to "understand the rules" and "reason." Judge Phelps then asked about the jury break down, and, learning that the breakdown was eleven to one, indicated that the jury should continue deliberating if it would "help" or allow the jury to "progress" without ever providing a counter-balancing instruction that Juror Radcliff should not abandon her conscien-

tiously held views. During the May 15 conference, Judge Phelps learned that Juror Radcliff felt that she had been "beaten" during the May 13 meeting and was feeling pressured by the other members of the jury to join the majority, but Judge Phelps again failed to give a counter-balancing instruction that Radcliff should not surrender her conscientiously held beliefs.

■ In sum, the California Court of Appeal's decision was "contrary to . . . clearly established Federal law" because it failed to apply clearly established Supreme Court law. 28 U.S.C. § 2254(d). After examining the relevant federal juror coercion cases, we hold that the state court's decision was erroneous: the judge's actions and statements were, as a whole, and under all of the circumstances, impermissibly coercive and resulted in a denial of Packer's constitutional right to a fair and impartial jury. Because the jury was considering both the murder and attempted murder counts when this coercion occurred, we conclude that the judge's coercion manifestly had a "substantial and injurious effect" on the jury's verdicts on these counts. *Brecht*, 507 U.S. at 637, 113 S.Ct. 1710, 123 L.Ed.2d 353.[16] We there-

15. The dissent contends that because defense counsel did not object to the judge's allowing the deliberations to continue with Juror Radcliff on the jury *after* the May 15 meeting, Packer should not now be able to argue that Juror Radcliff was coerced. However, there is no precedent that suggests that a defense attorney's desire to have a particular juror remain on the jury renders a judge's coercive statements to the jury harmless. Indeed, such a desire may make the need for a counter-balancing instruction even greater. Here, although defense counsel did argue that Radcliff should remain on the jury, he also urged that she not be pressured to change her vote and that the judge not meet privately with her in his chambers.

16. We disagree with the prosecution's contention that habeas relief should only extend to

the murder charge because the jury reached a verdict on the attempted murder charge before the juror coercion began. To the contrary, Foreman Wkye told Judge Phelps and counsel that the jury was continuing to deliberate about the attempted murder charge (count 2) on the afternoon of Friday, May 15. *See* ER 42, 110–11. We also disagree with Packer's contention that habeas relief should extend to *all* of the charges he was convicted of committing because none of the verdicts was, final when the juror coercion occurred. Sealed verdict forms on all but the murder and attempted murder charges were submitted to the court *before* the juror coercion occurred, and there is no indication in the record that any of the jurors wavered in their votes on these.charges.

fore reverse the district court's denial of the writ of habeas corpus and remand with instructions to grant the writ as to Packer's murder and attempted murder convictions.

**2. Although Packer's due process rights were violated when Judge Phelps ordered Packer to wear a leg brace during trial, Packer is not entitled to relief because the error was harmless.**

 Although the Due Process clause of the Fourteenth Amendment generally protects a defendant's right to appear at trial without shackles or other physical restraints, a trial judge's decision to restrain a defendant at trial is not unconstitutional per se. *Illinois v. Allen,* 397 U.S. 337, 344, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). The Supreme Court has held that in order to maintain the proper "dignity, order, and decorum" during court proceedings, "trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case." *Id.* at 343, 90 S.Ct. 1057. Because of their potential for prejudice, however, due process requires that restraints be used only as a "last resort." *Id.* at 344, 90 S.Ct. 1057.

 In this case, the only evidence supporting the Sheriff Department's application for a leg brace was unsworn, hearsay testimony regarding a potential witness's plan to do "stuff" while in Los Angeles. None of the evidence submitted at the hearing reflected that Packer was going to participate in the "stuff," and none of the evidence established that the "stuff" contemplated would cause Packer to engage in disruptive courtroom behavior or an attempt to escape. Moreover, Packer had never attempted escape and had, for the most part, a clean disciplin-

ary history while in custody. There were, in sum, no persuasive reasons why it was necessary to resort to restraints.

In addition, Judge Phelps never considered any alternatives less restrictive than the leg brace. In light of the fact that the evidence reflected only that "stuff" might happen if and when Holliday appeared as a witness, it would have been sensible to wait until Holliday was, in fact, called as a witness to impose any physical restraint. It would have been more sensible still to impose a physical restraint on Holliday, who was the flight risk, instead of Packer. Particularly in light of the fact that Holliday was never called as a witness at Packer's trial, Judge Phelps's action was unwarranted. Clearly, in this case the imposition of physical restraints was not a "last resort."

 Nevertheless, Packer is not entitled to habeas relief on this claim because he cannot show prejudice resulting from the leg brace. *Duckett v. Godinez,* 67 F.3d 734 (9th Cir.1995); *Castillo v. Stainer,* 983 F.2d 145, 149 (9th Cir.1992). None of the jurors who were interviewed after trial remembered seeing the leg brace on Packer. *See Castillo,* 983 F.2d at 149 (shackling was harmless error because defendant wore waist chain that could not be seen by the jury); *Jones,* 899 F.2d at 885 (no prejudice when defendant's handcuffs were hidden by his shirt or jacket at all times). Although Packer argues that the leg brace impeded his ability to participate in his defense, he has not shown that his alleged inability to contribute to his defense had a "'substantial and injurious effect or influence in determining the verdict.'" *Brecht,* 507 U.S. at 623, 113 S.Ct. 1710 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). In sum, the decision to order Packer to wear a leg brace did not deny him a fair trial under the circumstances.

## CONCLUSION

While we agree with the district court's rejection of Packer's leg brace claim, we reverse its decision to deny the writ of habeas corpus with respect to the murder and attempted murder convictions, because we uphold Packer's juror coercion claim as to those counts. As to the remaining counts on which Packer was convicted, we affirm the denial of the writ. Accordingly, we remand to the district court for the granting of an appropriate writ of habeas corpus on the murder and attempted murder counts.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

SILVERMAN, Circuit Judge, dissenting:

I respectfully dissent over two points.

## I. The Jury Issue

The majority glosses over a key fact concerning the jury problem: Defense counsel was aware of everything the judge had said and done, but instead of moving for a mistrial, defense counsel implored the judge to keep Radcliff on the jury and stated that he had no objection to allowing the deliberations to continue.

On the afternoon of May 15, the judge informed counsel of Radcliff's "public beating" note. Defense counsel responded:

Well, I think that she's being driven off the jury. And what she's saying here is she is angry and upset and that she's getting treated badly by the other jurors. *That doesn't make her a person that's unable to continue.* That just means that she doesn't like it.

(Emphasis added.)

The judge then stated his intention to interview Radcliff in chambers in the presence of both counsel. Before the interview began, defense counsel made it clear to the judge that he did not want to lose Radcliff as a juror:

[DEFENSE COUNSEL]: This would be the—if you decided to excuse her, this would be the second black juror and a woman, and a black woman. I think that we would then be deprived of a fair cross-section of the community and I would ask for a mistrial.

THE COURT: You mean based on the fact that there is a black person being dismissed?

[DEFENSE COUNSEL]: Yes.

Just before the interview commenced, defense counsel objected to the procedure of singling out Radcliff for interview on the grounds that the procedure would pressure her to "change her vote or be excused." However, *after* Radcliff was questioned and had left the room, defense counsel made only one statement: "Sounded like an intelligent, articulate person who has a difference of an opinion." He no longer voiced any objection to the procedure, made no mention of any coercion or pressure, and made no motion for mistrial.

After foreman Wyke was interviewed and left chambers, the judge announced his decision to "let them continue to deliberate." The judge also briefly discussed a minor scheduling issue. After stating his rulings, the judge said to counsel, "Any objection to that?" Defense counsel replied, "No, I don't."

A party is not permitted to wait-and-see what a verdict will be, and then upon receiving an unfavorable result, raise for the first time a problem with the jury of which he was previously aware. As the First Circuit put it, "We will not allow counsel to stand by quietly and gamble on a favorable verdict, only to complain when it turns out to be otherwise." *United States v. Morris,* 977 F.2d 677, 686 (1st

Cir.1992). Defense counsel knew full well how the judge had responded to the Radcliff situation, but defense counsel wanted *this* jury to continue its deliberations notwithstanding whatever the judge did, or could have done better. Had the judge declared a mistrial sua sponte based on either Radcliff's statements or the judge's own statements, the petitioner would have had a legitimate right to complain that a mistrial violated his right against Double Jeopardy. *See United States v. Shaw*, 829 F.2d 714, 719 (9th Cir.1987) (citing *Arizona v. Washington*, 434 U.S. 497, 505, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978)). Defense counsel's faith in this jury was not altogether misplaced: The jury acquitted the petitioner of 10 of the 17 counts.

Perhaps the reason that defense counsel did not seek a mistrial is that he recognized at the time, as the California Court of Appeal and the district court did later, that the judge's comments did no harm. *After* the coercion supposedly began, the jurors deliberated for at least an *additional* eight and a half hours. This fact strongly suggests the absence of coercion. We have held that claims of jury coercion were rebutted by much shorter periods of continued deliberations following supposed coercion. *See., e.g., United States v. Daas*, 198 F.3d 1167, 1180 (9th Cir.1999) (one hour); *United States v. Plunk*, 153 F.3d 1011, 1027 *amended on denial of reh'g*, 161 F.3d 1195 (9th Cir.1998), (roughly two hours); *United States v. Easter*, 66 F.3d 1018, 1023 (9th Cir.1995) (two and a half hours); *United States v. Lorenzo*, 43 F.3d 1303, 1307, n. 3 (9th Cir.1995) (five and one-half hours); *United States v. Bonam*, 772 F.2d 1449, 1451 (9th Cir.1985) (90 minutes); *United States v. Beattie*, 613 F.2d 762, 766 (9th Cir.1980) (three and a half hours).

In this case, the California Court of Appeal held that "the comments made and not made by the court to the jury did not coerce a particular verdict or deny Packer any constitutional rights." The petitioner has failed to demonstrate that this decision was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States, as required for relief under 28 U.S.C. § 2254(d)(1).

## II. The Leg Brace

I agree with the majority that the petitioner has failed to show that he was prejudiced by having to wear a leg brace under his clothing. However, I cannot agree with the portion of the opinion that says that the petitioner's rights were violated by his having to wear the brace to begin with. A trial judge has wide discretion to decide whether public safety considerations warrant increased security measures. *See Morgan v. Bunnell*, 24 F.3d 49, 51 (9th Cir.1994). The California Court of Appeal reviewed the trial court's hearing on the matter and held:

> The record at the hearing ... established Packer's potential for nonconforming future behavior, despite the hearsay nature of and unknown source of some of the information. The court thus acted within its discretion in minimizing the likelihood of courtroom disruption. The court need not wait for an escape or a violent tragedy to occur before ordering an appropriate physical restraint. The court's order was particularly appropriate in view of its finding that the "leg brace will not be visible to the jury; will not impede communications with [Packer's] lawyer; will not detract from the dignity or the decorum of the judicial proceeding; will not be painful to the defendant; and [the defendant] will be seated before the jury enters and remain seated until the jury leaves." Although after the trial Packer complained about the emotional distrac-

tion and physical discomfort of the leg brace, it was a reasonable physical restraint warranted by the circumstances revealed at the hearing and not necessarily visible by the jury.

The petitioner has not shown that the Court of Appeal's decision on this point was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1).