Filed 1/22/14  In re Joey V. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

<table>
<tr>
<td>In re JOEY V., a Person Coming Under the Juvenile Court Law.</td>
<td></td>
</tr>
<tr>
<td>THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOEY V.,<br><br>    Defendant and Appellant.</td>
<td>F066481<br><br>(Super. Ct. No. 09CEJ601172-3)<br><br>**OPINION**</td>
</tr>
</table>

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Fresno County.  James A. Kelley, Jr., Judge.

Arthur L. Bowie, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Jeffrey D. Firestone, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Levy, Acting P.J., Kane, J., and Detjen, J.

At a contested jurisdiction hearing, the juvenile court found true an allegation that appellant, Joey V., a minor, committed an assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1))[1] and declared the offense a felony. At the subsequent disposition hearing, the court adjudged appellant a ward of the court, placed him under the supervision of the probation officer until May 3, 2014, and ordered him committed to the New Horizons program (New Horizons) for a period not to exceed 365 days.

On appeal, appellant contends (1) the evidence was insufficient to support the instant adjudication, and (2) the court abused its discretion in ordering appellant committed to New Horizons. We affirm.

## FACTS

### Petitioner's Case

Kimberly Armstrong testified that on October 22, 2012 (October 22), she and appellant, her son, got into an argument regarding appellant's refusal to wash some dishes, and Armstrong told appellant that she would not allow his girlfriend to visit if he "continue[d] to act this way."[2] At that point, the argument "stopped," Armstrong went into the living room, and appellant went into another room "to calm down."

While Armstrong was in the living room, appellant "came out," holding a "little knife." Appellant then went into the kitchen, and said "I'm done" and "I'm tired of this." He "brought up other situations … about his brother and his cousin" who had died two weeks previously in a car crash. Appellant "took [these deaths] really hard." He pointed the knife at his throat, and both he and Armstrong began crying and talking about things appellant "was depressed about." Armstrong was standing in the living room,

---

[1]     Except as otherwise indicated, all statutory references are to the Penal Code.

[2]     Except as otherwise indicated, information in the "Petitioner's Case" section of our factual summary is taken from Armstrong's testimony.

2

approximately eight to ten feet away from appellant. At this point, Armstrong's husband, Joey Sarabia called, and Armstrong answered the phone and "pushed talk."

While appellant was holding the knife, standing in the kitchen, he grabbed the neckline of his shirt and ripped the shirt. Thereafter, appellant "came to the living room, and then he handed [Armstrong] the knife because [she] asked for it." Appellant "was giving [the knife] to [Armstrong], but [it] was closed and everything," and it "fell in the couch."

At some point after appellant gave Armstrong the knife, Officer Mark Clifton and Armstrong's husband, who, Armstrong assumed had called the police, arrived, followed "a minute or two" later by two other police officers, including Officer Pearce.

According to Armstrong, appellant did not point the knife at her, "didn't have it close to … or near [her]," did not "come towards [her] with the knife," and did not "swing the knife at [her]." Armstrong was not in fear for her safety. Appellant "would never hurt [her]."

After Armstrong testified, Selma Police Officer Lance Pearce testified to the following: On October 22, in responding to a 911 call "involving [appellant] and … a knife," he went to a residence and made contact with Armstrong, who was standing on the porch. Pearce asked where appellant was, at which point appellant walked out the front door. After determining appellant did not have a knife, Pearce "secured him for officer safety," and then spoke with Armstrong. She was "[v]ery upset" and "[v]ery shaken up." She told Pearce the following: She and appellant "got into an argument" about appellant not wanting to clean dishes and appellant's girlfriend not being allowed to come to the residence, at which time appellant "went into his room" and said to Armstrong, while he was in his room, "Fuck you, dog." Then, as Armstrong was walking toward appellant's room "to confront him," appellant "came out of the room … with the knife." He was "swinging the knife back and forth" and "yell[ing] at [Armstrong], … at which time she … got scared." At that point, Armstrong "retreated … to the kitchen

3

where she then called the police department." While she was calling the police, appellant "got upset" and "continued yelling that he wanted to die, at which time he was upset and … swinging the knife around." While he was yelling, "he cut off his shirt and his necklace that was around his neck." He "threw [the knife] down … when he heard the sirens."

Armstrong testified to the following: She did not tell Pearce appellant swung a knife at her and she did not call the police. Appellant did not say, "Fuck you, dog." Pearce did not ask Armstrong "what happened." He only asked her for her name, telephone number and address, which information Armstrong gave him.

### Defense Case

Joey Sarabia testified to the following: On October 22, he telephoned Armstrong. She "put the phone down" and he heard her say, "Give me the knife." Appellant had had "suicidal issues at times" and Sarabia, believing that appellant was "threatening himself with the knife" and afraid appellant "was going to hurt himself," called 911. Appellant had never threatened Sarabia and he had never seen appellant threaten Armstrong.

### Additional Factual Background[3]

Appellant was initially adjudged a ward of the juvenile court and placed on probation in January 2010, following an adjudication of battery (§ 242.) Appellant's mother told a police officer that appellant pushed her when she would not allow him to attend a high school football game.

Appellant was readjudged a ward under Welfare and Institutions Code section 777 and continued on probation in June 2010, after he "left his residence despite being directed to remain home by his parent"; in August 2010, after Armstrong reported to a police officer that appellant threatened to kill her; in October 2010, after officers,

---

[3] Except as otherwise indicated, information in this section is taken from the report of the probation officer (RPO) prepared in advance of the disposition hearing.

responding to a report of a "disturbance between [appellant] and a parent," learned that appellant "became aggressive towards [Armstrong] when she attempted to wake him up for school"; in January 2011, after appellant "failed to keep an appointment with Families First and ACT"; and in May 2011, after appellant "cut off his electronic monitor and left his residence without permission."

In August 2011, appellant was adjudicated of a misdemeanor violation of section 308, subdivision (b) (possession of smoking paraphernalia by a minor), for possessing a "smoking pipe device," and in August 2011, he was adjudicated of misdemeanor battery (§ 242), after he "pushed his mother in the chest after she tried turning off the music [appellant] was listening to." Following each of these adjudications, appellant was readjudged a ward and continued on probation. Appellant's probation was terminated in a Welfare and Institutions Code section 777 proceeding in September 2012, after appellant "failed to obey lawful directive of DPO due to not completing his community service and failed to attend school as required by law."

Appellant "failed to complete … Behavioral Health Court, Electronic Monitoring, and Community Service."

Appellant's mother reported the following: Appellant has been diagnosed as suffering from "ADD/ADHD, Bi-polar, Schizophrenia, and Depression"; he currently takes several psychotropic medications; he "has attempted suicide or expressed suicidal ideation in the past"; and he "has been hospitalized in regards to mental health issues on 4 previous occasions."

Appellant is a "special education student." He was diagnosed with a learning disability when he was in the third grade. Sarabia reported appellant "has a history of poor attendance[] [and] refusing to attend school." School records indicate appellant has been suspended in the past for, inter alia, "inappropriate sexual behavior," fighting and bullying another student.

5

At the disposition hearing, the probation officer told the court she believed appellant is "going to receive individual and mental health counseling during the duration of this New Horizons program." The court asked the officer, "is [it] your position" that "family counseling and mental health counseling" is "included in New Horizons?" The officer answered, "That's right."

*Procedural Background*

The probation officer recommended in the RPO that appellant be committed to New Horizons for a period not to exceed 365 days.

At the disposition hearing, appellant's counsel "request[ed] that [appellant] serve less time for this offense," and argued that a commitment period of "six or maybe even eight months" would be appropriate.

## DISCUSSION

*Sufficiency of the Evidence*

Appellant contends the evidence was insufficient to support his adjudication of assault with a deadly weapon, viz., a knife, on Armstrong. We disagree.

In determining whether the evidence is sufficient to support a finding in a juvenile court proceeding, the reviewing court is bound by the same principles as to the sufficiency and substantiality of the evidence which govern the review of criminal convictions generally. (*In re Roderick P.* (1972) 7 Cal.3d 801, 809.) Those principles include the following: "In addressing a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence— evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence…. "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might

6

also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.""" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)

"[A] reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment." (*People v. Cantrell* (1992) 7 Cal.App.4th 523, 524.)

A conviction for assault with a deadly weapon (§ 245, subd. (a)(1)) requires proof of the crime of assault, plus proof that it was accomplished by the use of a deadly weapon. An assault is "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) "The mens rea [for assault] is established upon proof the defendant willfully committed an act that by its nature will probably and directly result in injury to another, i.e., a battery." (*People v. Colantuono* (1994) 7 Cal.4th 206, 214 (*Colantuono*).) In addition, "a defendant must 'actually know[] those facts sufficient to establish that his act by its nature will probably and directly result in physical force being applied to another.'" (*People v. Chance* (2008) 44 Cal.4th 1164, 1169 (*Chance*).)

As appellant impliedly concedes, under the principles of appellate review summarized above, we are not compelled to accept as true Armstrong's testimony and, indeed, we must presume that events unfolded as, according to Pearce's testimony, Armstrong said they did when the officer spoke with her on October 22. Appellant argues that even under that version of events, the evidence was insufficient to establish he committed an assault. Specifically, he first argues that there was no evidence of the distance between Armstrong and appellant when appellant was swinging the knife back and forth, and thus there was no evidence Armstrong was ever "within the range of harm." Therefore, he contends, the evidence was insufficient to establish (1) that he committed an act that by its nature would directly and probably result in the application

7

of force to Armstrong, (2) that he had actual knowledge of facts sufficient to establish that his actions would directly and probably result in physical force being applied to Armstrong, and (3) that the knife, as appellant used it, constituted a deadly weapon. The major legal premise of all these claims is that the act of "[s]winging a knife around" can only constitute an assault if the purported victim was, at the time of the act, "within a zone of harm." As we explain below, this premise is false, and therefore these arguments fail.

As the California Supreme Court has explained, "'Holding up a fist in a menacing manner, drawing a sword, or bayonet, presenting a gun at a person who is within its range, have been held to constitute an assault. So, *any other similar act*, accompanied by such circumstances as denote an intention existing at the time, *coupled with a present ability of using actual violence against the person of another*, will be considered an assault.' [Citations.]" (*Colantuono*, *supra*, 7 Cal.4th at p. 219, second italics added.)

Here, appellant's act of swinging a knife through the air was similar to, and indeed, even more threatening than, holding up a fist in a threatening manner or any of the other acts cited by our Supreme Court in the passage quoted above. Therefore, as indicated above, the remaining question before us is whether the evidence was insufficient to establish the "present ability" element of assault. On this point, we find instructive *Chance*, *supra*, 44 Cal.4th 1164.

In that case, the California Supreme Court, in discussing the "present ability" requirement of section 240, stated: "[I]t is a defendant's action enabling him to inflict a present injury that constitutes the actus reus of assault. There is no requirement that the injury would necessarily occur as the very next step in the sequence of events, or without any delay…. [A]ssault does not require a direct attempt at violence. [Citation.] 'There need not be even a direct attempt at violence; but any indirect preparation towards it, under the circumstances mentioned, such as drawing a sword or bayonet, or even laying one's hand upon his sword, would be sufficient.' [Citations.] [¶] … [W]hen a

8

defendant equips and positions himself to carry out a battery, he has the 'present ability' required by section 240 if he is capable of inflicting injury on the given occasion, even if some steps remain to be taken, and even if the victim or the surrounding circumstances thwart the infliction of injury." (*Chance*, *supra*, 44 Cal.4th at p. 1172.) "'The fact an intended victim takes effective steps to avoid injury has never been held to negate this "present ability."'" (*Id*. at p. 1174.)

In a similar vein and much earlier, in *People v. Yslas* (1865) 27 Cal. 630, our Supreme Court stated: "[W]here there is a clear intent to commit violence accompanied by acts which if not interrupted will be followed by personal injury, the violence is commenced and the assault is complete." (*Id*. at p. 633.) And, in the portion of the opinion fatal to appellant's "zone of harm" argument, the court further stated: "It is not indispensable to the commission of an assault that the assailant should be at any time within striking distance. If he is advancing with intent to strike his adversary and come sufficiently near to induce a man of ordinary firmness to believe, in view of all the circumstances, that he will instantly receive a blow unless he strike in self-defense or retreat, the assault is complete. In such a case the attempt has been made coupled with a present ability to commit a violent injury within the meaning of the statute." (*Id*. at p. 634.) Our Supreme Court in *Chance*, *supra*, 44 Cal.4th at page 1174, summarized *Yslas* as follows: "In *Yslas*, the defendant approached within seven or eight feet of the victim with a raised hatchet, but the victim escaped injury by running to the next room and locking the door. Yslas committed assault, even though he never closed the distance between himself and the victim, or swung the hatchet. (*Yslas*, *supra*, 27 Cal. at pp. 631, 633–634.)"

Appellant seeks to distinguish *Yslas* on the ground that, here, by Armstrong's account as related by Officer Pearce, appellant was swinging the knife and yelling *as Armstrong approached him*; he did not advance on her with the knife in hand. This is a distinction without a difference. There is no suggestion in the record that appellant acted

9

in self-defense.  The juvenile court reasonably could conclude (1) that appellant swung the knife as Armstrong approached, intending to strike her, and Armstrong, in fear of being stabbed or slashed, retreated to the kitchen, and (2) that appellant was aware of these facts.  Under the authorities cited above, regardless of whether Armstrong was ever within what appellant calls the "zone of harm," the evidence supported the conclusion that appellant had the present ability to commit, and did commit, an assault with a deadly weapon.

Appellant also challenges the sufficiency of the evidence supporting his adjudication on the grounds that, he asserts, there was no evidence of what Armstrong was afraid of when she retreated to the kitchen, and no evidence appellant threw the knife, yelled while swinging the blade, or "tried to stab or cut" Armstrong.  These points are without merit.

First, in fact there was evidence appellant was yelling as he swung the knife. Officer Pearce testified Armstrong told him appellant "came out of the room … with the knife, at which time she was walking towards the room to confront him and *he was swinging the knife back and forth and … yelled* [*sic*] *at her*, … at which time she then got scared."  (Italics added.)  Second, it is reasonably inferable from this evidence that Armstrong was afraid of being cut by the knife.  Finally, as demonstrated above, under the circumstances of this case, it is of no moment that appellant did not get close enough to "stab or cut" Armstrong.  On this record, there was sufficient evidence presented to establish appellant committed an assault with a deadly weapon.

### *Commitment to New Horizons*

Appellant contends the juvenile court abused its discretion in ordering him committed to New Horizons.

"A juvenile court's commitment order may be reversed on appeal only upon a showing the court abused its discretion."  (*In re Robert H.* (2002) 96 Cal.App.4th 1317, 1329-1330; accord, *In re Todd W.* (1979) 96 Cal.App.3d 408, 416.)  Appellant contends

10

the juvenile court abused its discretion in ordering a commitment to New Horizons for up to one year. We disagree.

A commitment to New Horizons requires a two-part showing. There must be evidence demonstrating (1) such a commitment will be of benefit to the minor, and (2) less restrictive alternatives are ineffective or inappropriate. (Cf. *In re Teofilio A.* (1989) 210 Cal.App.3d 571, 576 (*Teofilio A.*).)[4] An appellate court will not lightly substitute its judgment for that of the juvenile court but rather must indulge all reasonable inferences in favor of the decision and affirm the decision if it is supported by substantial evidence. (*In re Angela M.* (2003) 111 Cal.App.4th 1392, 1396; *In re Asean D.* (1993) 14 Cal.App.4th 467, 473 (*Asean D.*).)

"'In determining whether there was substantial evidence to support the commitment, we must examine the record presented at the disposition hearing in light of the purposes of the Juvenile Court Law. (Welf. & Inst. Code, § 200 et seq....)'" (*In re Lorenza M.* (1989) 212 Cal.App.3d 49, 53.) "In 1984, the Legislature amended the statement of purpose found in section 202 of the Welfare and Institutions Code. *It now recognizes punishment as a rehabilitative tool and emphasizes the protection and safety of the public.*[5] [Citation.] The significance of this change in emphasis is that when we

---

**4** This is the showing required for the most restrictive disposition available in the juvenile justice system, viz., commitment to the Department of Corrections and Rehabilitation, Division of Juvenile Facilities, formerly known as the California Youth Authority (CYA). In our view, as appellant asserts and respondent does not dispute, the same showing is required a for less restrictive disposition such as the New Horizons commitment ordered in the instant case.

**5** Welfare and Institutions Code section 202 provides in relevant part: "Minors under the jurisdiction of the juvenile court as a consequence of delinquent conduct shall, in conformity with the interests of public safety and protection, receive care, treatment, and guidance that is consistent with their best interest, that holds them accountable for their behavior, and that is appropriate for their circumstances. *This guidance may include punishment that is consistent with the rehabilitative objectives of this chapter.*" (Welf. & Inst. Code, § 202, subd. (b), italics added.)

11

assess the record in light of the purposes of the Juvenile Court Law [citation], we evaluate the exercise of discretion with punishment and public safety and protection in mind." (*Id.* at pp. 57-58, fn. omitted, italics added; accord, *Asean D.*, *supra*, 14 Cal.App.4th at p. 473 ["the 1984 amendments to the juvenile court law reflected an increased emphasis on punishment as a tool of rehabilitation, and a concern for the safety of the public"].)

"'[T]his interpretation by no means loses sight of the "rehabilitative objectives" of the Juvenile Court Law. [Citation.] Because commitment to CYA cannot be based solely on retribution grounds [citation], there must continue to be evidence demonstrating (1) probable benefit to the minor and (2) that less restrictive alternatives are ineffective or inappropriate. However, these must be taken together with the Legislature's purposes in amending the Juvenile Court Law.' [Citation.]" (*In re Carl N.* (2008) 160 Cal.App.4th 423, 433.)

Appellant argues as follows: The court "should have" ordered "outpatient treatment or some less restrictive placement"; "there was not substantial evidence that the goals of the juvenile delinquency system were going to be met by removing [appellant] from the care and custody of his parents and placing him in a locked facility"; and appellant had "successfully completed his prior grant of probation on September 22, 2012," and therefore "the evidence demonstrated that lesser restrictive alternatives had been making progress in rehabilitating [him]."

As best we can determine, appellant contends these factors establish that the evidence was insufficient to prove that alternatives less restrictive than commitment to New Horizons would be ineffective or inappropriate. We disagree. At least two factors support the conclusion that a disposition less restrictive than commitment to New Horizons for up to one year would be both inappropriate—because any such disposition would not be adequate to hold appellant accountable for his actions and/or provide for the safety and protection of the public—and ineffective. First, appellant stands adjudicated

12

of a serious offense. (*In re Samuel B.* (1986) 184 Cal.App.3d 1100, 1104, overruled on other grounds in *People v. Hernandez* (1988) 46 Cal.3d 194, 206, fn. 14 [in determining disposition of juvenile offender, "gravity of the offense is always a consideration with other factors"]; Welf. & Inst. Code, § 725.5 [factors to consider in determining appropriate disposition include "the circumstances and gravity of the offense committed by the minor"].) In addition, appellant has failed to reform despite numerous grants of probation, which included attempts to rehabilitate appellant through means less restrictive than confinement in New Horizons, including the electronic monitoring program and community service, both of which appellant failed to complete.

As appellant indicates, after he violated his probation in April 2012 by failing to complete his community service and attend school, he apparently refrained from further violations for several months and his probation was terminated in September 2012. However, he committed the instant felony the following month. This record hardly supports, much less compels, the conclusion that, as appellant claims, he was "on the road to rehabilitative success," and that therefore the court abused its discretion in failing to order a disposition less restrictive than commitment to New Horizons.

Appellant also contends the evidence was insufficient to establish that commitment to New Horizons would be of probable benefit. Specifically, he argues, "there is no evidence in the record that [he] would receive adequate services at the New Horizon[s] program to address his educational, psychological or emotional needs." This argument presents a much closer question.

No doubt, as appellant asserts, he is in serious need of mental health and educational services. And, as appellant points out, the RPO is silent as to what services are provided at New Horizons that could meet these needs, and provides no analysis as to how, or even if, appellant might benefit from commitment to New Horizons. However, notwithstanding the lack of information in the RPO, the probation officer represented to the court at the disposition hearing that "family counseling" and "mental health

13

counseling" were "included in New Horizons." This evidence, coupled with the evidence of appellant's mental health and educational needs, provides support for the conclusion that a commitment to New Horizons would be of probable benefit to appellant.

Moreover, appellant stands adjudicated of a felony offense that involved violence, and that offense was preceded by his commission of two misdemeanors, one of which also involved violence, and multiple violations of probation. As indicated above, the Juvenile Court Law recognizes punishment as a "rehabilitative tool." (*In re Lorenza M.*, *supra*, 212 Cal.App.3d at p. 53.) On this record, the juvenile court reasonably could have concluded appellant was in need of the kind of "guidance" that comes with "punishment that is consistent with the rehabilitative objectives of [the Juvenile Court Law]" (Welf. & Inst. Code, § 202, subd. (b)) and that removing him from the custody of his parents and confining him in New Horizons could provide that guidance. Thus, although the question is a close one due to the paucity of information about New Horizons, we conclude the evidence was sufficient to establish that the disposition in the instant case would benefit appellant.

Appellant also argues that the court improperly ordered appellant committed to New Horizons "solely for the purpose of punishment and retribution." As best we can determine, appellant bases this argument, in turn, on the claim that the following statement made by the court at the disposition hearing constitutes inappropriate "classic criminal court sentencing language": "I read and considered this *sentencing* recommendation or this disposition, I guess we call it, and I think it's appropriate." (Italics added.) There is no merit to this contention.

We recognize that proceedings in juvenile court are not deemed criminal proceedings (Welf. & Inst. Code, § 203). The terminology often used reflects this fact. Thus, for example, minors are "committed" to placements such as New Horizons, not sentenced, as are adults, and juvenile courts make such commitments at disposition, rather than sentencing, hearings. However, here the court immediately corrected itself

14

and referred to its "disposition." A single usage of the word "sentencing" does not compel the conclusion that the juvenile court had lost sight of the rehabilitative objectives of the Juvenile Court Law or the fundamental principle that a commitment cannot be based on retribution grounds.

Finally, appellant argues that the court abused its discretion in ordering commitment to New Horizons because, he asserts, the court "failed to adequately consider" appellant's "psychological, emotional, and educational treatment needs." As best we can determine, appellant bases this claim on the court's failure to explicitly mention these needs, or dispositional alternatives that might address these needs, in announcing its disposition order. This contention too is without merit.

In *In re Ricky H.* (1981) 30 Cal.3d 176 (*Ricky H.*), the minor, challenging his commitment to CYA, argued "that the superior court did not give adequate consideration to less restrictive placement alternatives. Specifically, the social study lacked data regarding specific alternative placements. The court failed to respond to counsel's argument that the local youth center would be a more appropriate placement. [The minor] assert[ed] that the court had a duty to actively inquire as to the suitability of less restrictive placements …." (*Id*. at p. 182.) Our Supreme Court rejected this argument; the court stated, "It is true that the lack of such a statement [of reasons for CYA commitment] makes appellate review of the superior court's exercise of discretion more difficult and uncertain [citation], but *the absence of inquiry does not establish that the superior court failed to consider other placements*." (*Id*. at p. 184, italics added.) Thus, as this court stated in *Teofilio A.*, *supra*, 210 Cal.App.3d at page 577, the court in *Ricky H.* noted that "if there is evidence in the record to show a consideration of less restrictive placements *was before the court*, the fact the judge does not state on the record his consideration of those alternatives and reasons for rejecting them will not result in a reversal." (Italics added.)

15

Here, at the disposition hearing, appellant's counsel argued for a commitment of less than the one-year maximum recommended by the probation officer. In addition, the RPO covers appellant's educational and mental health problems, and lists the various means used in the attempt to rehabilitate appellant during his multiple grants of probation: electronic monitoring, community service, and Behavioral Health Court. Thus, the record shows that the juvenile court had before it information regarding less restrictive dispositions and appellant's various needs. No more is required to establish the court considered such matters. (*Ricky H.*, *supra*, 30 Cal.3d at p. 184.)

## DISPOSITION

The judgment is affirmed.